672 So.2d 1150 (1996)
STATE of Louisiana
v.
Milton WILLIAMS.
No. 95-KA-0579.
Court of Appeal of Louisiana, Fourth Circuit.
April 10, 1996.
*1151 Harry F. Connick, District Attorney, Orleans Parish, Giustina L. Persich, Assistant District Attorney, Orleans Parish, New Orleans, for appellee.
Dwight Doskey, New Orleans, for appellant.
Before BYRNES, WALTZER and LANDRIEU, JJ.
WALTZER, Judge.

I. STATEMENT OF THE CASE

Defendant Milton Williams was found guilty by a 12 person jury for the second degree murder of his wife, Karen Williams. The defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on December 19, 1994. Defendant appeals.

II. STATEMENT OF THE FACTS

On October 21, 1993, defendant Milton Williams shot and killed his wife, Karen Williams, with a single bullet from a .357 Magnum. On the night of the murder, the *1152 defendant returned home from a plumbing job and accused his wife of flirting with a handyman. After a short argument, the defendant shot his wife in the head from a distance of two and one-half to three and one-half feet.
Milton Williams, Jr., the thirteen year old son of the defendant and victim, testified at trial that when he arrived home after school on October 21, 1993, his mother was on the telephone, his father was around the house, and Mr. Fred was working on tiles in the bathroom. While Milton, Jr. watched television in the upstairs den, his father came upstairs to check on the progress of the tile work, and then left to do a plumbing job. The witness noticed the defendant's pistol on the entertainment center. The witness picked up the weapon, took it into his parents' room and placed it on his father's nightstand. After having dinner with his mother, the witness returned to the upstairs family room where he finished his homework and watched television. Milton Williams returned late that night and got into an argument with Karen. The defendant accusing her of flirting with Fred, the tile man and called her a "hussy" and a "no-good bitch." Mrs. Williams declared her innocence. She followed her husband upstairs, through the room where Milton, Jr. was watching television and into their bedroom. Milton, Jr. heard his father tell his mother to leave him alone "before I have to hurt you." Milton and Karen continued to argue for approximately five minutes when Milton, Jr. heard a shot. He looked over in the bedroom and saw his mother on the floor with his father beside her in his underwear. The defendant told his son that he did not mean to shoot her; the gun had been in his hand and just went off. The son then called for emergency assistance while his father attempted CPR.
Milton, Jr. also testified that he had been present on numerous occasions when his father beat and threatened his mother. After the murder, the defendant called his son one night and told him to tell everyone that he and Karen were not arguing that night. The defendant told Milton, Jr. that he picked up the gun because he heard something outside and that as the defendant was turning the gun, the gun went off and shot the victim. However, Milton, Jr. testified that he knew the shooting was not accidental because the gun was not cocked when he placed the weapon on the his father's nightstand. Milton, Jr. stated that his father had to have cocked the gun in order for the gun to discharge.
Four police officers responded to the call. Officers Euclid Talley and Lawrence Zapata were the first officers to respond to the call. Officers Clover and Meunier showed up next. Officer Talley knocked on the front door. The defendant opened the door, wearing only his underwear and covered with blood. Officer Talley asked the defendant what happened. The defendant told Officer Talley that he accidentally shot his wife. Officer Zapata detained the defendant while the officers checked the house to insure their safety. Officers Clover and Meunier checked the first floor while Officer Talley went upstairs. Officer Talley found Karen Williams in the bedroom. She was lying on her back with her head turned to her right side. He checked her neck pulse and breathing. He detected a faint pulse. The victim was lying in a large pool of blood. The officer also observed a Smith and Wesson .357 caliber lying on the floor near the dresser where the victim was lying. After checking the victim, the officer informed the radio dispatcher that they had a life and death situation and to step up the medical emergency unit to code three. The emergency medical team arrived about five minutes later. The officer then returned to the first floor where he spoke with Milton Williams, Jr. After speaking with the boy, the officer returned to the defendant. The officer advised the defendant he was under arrest for aggravated battery. The defendant was handcuffed and advised of his Miranda rights. The officer then asked the defendant if he wanted to make any statements. The defendant reiterated his prior statement that he and his wife had not been arguing and were not involved in any type of physical altercation. They were preparing to go to bed. He placed the weapon on the nightstand and at that time it discharged. He then noticed that the bullet had struck his wife.
*1153 Officer Lawrence Zapata detained Milton Williams while the other officers checked on the victim's condition. Officer Zapata testified that the defendant did not understand why he could not go upstairs or why Officer Zapata did not go upstairs to help his wife. The officer told the defendant to calm down and suggested that he sit down. Officer Zapata advised the defendant again of his Miranda rights and told the defendant he was under investigation for the aggravated battery on his wife. The defendant indicated that he understood his rights. The officer asked the defendant why he and his wife were arguing. The defendant stated they were just arguing. He wanted to scare his wife. During the argument, he slammed the gun down on a piece of furniture and the gun discharged accidentally.
Officer Donald Clogher and his partner, Officer Meunier, arrived immediately after Officers Zapata and Talley. The defendant answered the door as they arrived. The officers noted that the defendant was in his underwear and was bloody. The officers proceeded upstairs where they discovered the victim. Officer Clogher interviewed the defendant to obtain information for the incident report. The officer sought the defendant's name, address, date of birth and other vital information for the cover sheet of the police report. The defendant had already been advised of his Miranda rights. As the officer was obtaining information for the cover sheet, the defendant told the officer that he and the victim were getting ready for bed. The defendant said when he went to move his gun, which was cocked, the gun fell and discharged, striking the victim. The defendant claimed the gun went off after it fell. The defendant said he did not move the gun because he was afraid it would go off again.
Officer James Ducos of the New Orleans Police Department Crime Laboratory processed the crime scene on October 21, 1993. Photographs were taken, evidence was collected, and a sketch of the crime scene was drawn. The officer took blood samples from the defendant. He also secured the loaded weapon which had been found on the bedroom floor. There was only one spent casing. The officer also collected a pair of blood stained, gold colored sweatpants which had been cut off of the victim by the emergency medical technicians. Although the weapon was dusted for fingerprints, the officer was not successful in developing any prints from the weapon.
New Orleans Homicide Detective Anthony Small was called to the crime scene when it became apparent Karen Williams might die. When Detective Small arrived on the scene, Milton Williams had already been detained by the other police officers. Detective Small testified that the defendant was only wearing underwear and had blood stains on his face, chest, arms and legs. Detective Small directed Officer Ducos to take a cotton swab of the blood that was on the defendant. Small also instructed Ducos to take samples of the blood found on the second level of the residence and to collect the weapon, a four inch .357 stainless steel revolver with a brown wooden handle, found on the floor. Small then took custody of the defendant and transported him to the Homicide office. Small informed the defendant that he was being arrested for his wife's murder and advised the defendant of his Miranda rights. The defendant chose not to waive his rights and did not make any statement to the officer. Detective Small also testified that he made a taped copy of the 911 call made by the defendant after the shooting. The taped copy of the 911 call was played for the jury.
Officer Kenneth Leary of the New Orleans Police Crime Laboratory testified that only one round had been fired from the gun. He further testified that the gun, if cocked, has a five pound trigger pull, and in the double-action mode when the gun is not cocked, has an eleven and one-half pound trigger pull. The pistol also had an internal block covering the firing pin which could be moved out of the way only by pulling the trigger. The officer concluded that if the gun was dropped, it would not discharge accidentally. Officer Leary also stated that he conducted some test firing of the weapon. These tests revealed that the stippling found on the victim would only occur when the gun was fired between three and three and one-half feet from the victim.
*1154 Dr. William Newman, a professor of pathology at LSU Medical School and pathologist with the Orleans Parish Coroner's Office, conducted the autopsy on Mrs. Williams. He testified that Mrs. Williams died of a single gunshot wound to the head, near the right eye. There was stippling under the right eye which indicated that gun was approximately two and one-half feet to three feet from the victim's body when it was discharged.
Sheila Craig, the victim's sister, testified that the defendant and the victim were married in 1979 and had one son, Milton, Jr., from the marriage. The victim also had two children from a prior marriage. Ms. Craig also testified concerning incidents of abuse she observed. On one occasion in 1989, Ms. Craig received a phone call from her sister telling her to call the police. Milton Williams was beating Karen with a baseball bat. Sheila Craig went to her sister's house with her children and brother. The victim was limping and holding her arm. The defendant told the witness and her family to leave or he would kill all of them. The victim's daughter and son were present during the incident. Once the police arrived, they spoke with the defendant and the victim. The officers told the defendant to leave. The officers then escorted the victim to Baptist Hospital where she received care for her injuries. When they returned home from the hospital, Sheila Craig, Karen Williams, their brother, and their children barricaded themselves in the house to protect themselves from the defendant. Sheila Craig testified that she slept with her sister because her sister was afraid the defendant might try to come through the window. Ms. Craig further stated that she had seen evidence of other beatings. The victim had busted lips and black eyes on numerous occasions. The victim also had bruises on her arms and other parts of her body.
Ms. Craig acknowledged that there were some good times in the defendant's and victim's relationship. However, even the good times would turn bad. In 1990, the victim sought assistance and shelter at the Metropolitan Battered Women's Center. After the victim left the shelter, she went to live with her mother for approximately two months. Thereafter, she moved back in with the defendant.
Kimberly Johnson, the victim's daughter and defendant's step-daughter, testified that Milton and Karen Williams were married when the witness was seven years old. She lived with them until she was eighteen years old. The witness stated that she got along with Milton except when he would beat her mother. She witnessed Milton beat her mother in 1979 when her mother was pregnant. The defendant busted the victim's lip and threatened to kill her. On another occasion, Milton kicked and hit the victim causing her to suffer a black eye. This incident also occurred while Karen was pregnant. Milton continually made threats against his wife Karen.
Kimberly also recalled the incident in which the defendant beat her mother with a baseball bat. She testified that Milton and her mother had been arguing in the kitchen. She heard him hitting her mother. Kimberly then went into the kitchen and confronted him. Kimberly got a knife and told Milton to stop. Milton responded by cursing Karen and threatening to hurt her. Milton then left and returned with a bat. Kimberly had put the knife away after Milton left. After Milton returned, he started swinging the bat at Kimberly. While Karen was trying to protect Kimberly, Milton swung the bat at Karen, hitting her several times. Milton threatened to kill Kimberly and Karen.
After that incident in 1989, Kimberly moved to Texas to live with her aunt. She stated that during the ten years she lived with Milton and Karen, she never saw her mother initiate a fight. Kimberly continued contact with her parents after moving to Texas. She wrote letters to Milton and her mother every week. Kimberly testified that she did not hate Milton. She still loved him.
Kimberly Johnson further testified that when she went to visit Milton in jail immediately after the shooting, he asked her to tell everyone that he and Karen had a good relationship. The defendant told Kimberly the shooting was an accident. He heard something outside on the scaffolding. He *1155 picked up the weapon and the gun discharged.
Cinnamon Billy Smith, an employee of the Metropolitan Battered Women's Program in 1991, testified that Karen Williams sought shelter with the clinic from May 1991 to July 1991. While she was staying at the shelter, Milton located the shelter and stole Karen's car. As a result, Karen was asked to leave the shelter. There is a policy which requires women to leave a shelter once a husband or batterer shows up at the shelter. This had happened to the victim at another shelter. The victim had been transferred to Metropolitan's shelter after her husband had found her at the other shelter.
A friend of the victim, Linda Brion, also testified as to the abuse Karen Williams suffered. Ms. Brion stated that she was present on one occasion when Milton pushed Karen's head against the wall and then pushed her to the floor. Karen was pregnant with her son at the time of this occurrence. On another occasion, Milton forced Karen to leave their house. He was arguing with her and had a shotgun in his hand. The defendant had put the victim out of the house on other occasions. One time, the defendant chased the victim, who was unclothed at the time, out of the house. A neighbor gave the victim some clothes to wear. Ms. Brion also heard the defendant threaten the victim. On several occasions, the witness would be on the phone with the victim and overhear the defendant tell the victim to get off the telephone before he blew her brains out.
Ms. Brion also testified that the defendant threatened the victim even after they separated. Karen was living on Banks Street at this time. Ms. Brion, who was visiting the victim on this particular day, stated that Milton came to the house. He threatened to shoot the house up if Karen would not let him in the house. Milton attempted to enter the house by tearing the door down, but he was not successful. The witness further stated that she saw the victim with bruises on all parts of her body on various occasions.

III. DISCUSSION

A. Errors Patent

A review of the record for errors patent reveals none.

B. Assignment of Error No. 1

In his first assignment of errors, the defendant contends the trial court erred in allowing the introduction of Prieur evidence, that is, evidence of prior beatings and threats allegedly committed by the defendant against the victim.
The Louisiana Supreme Court recently restated the law concerning the introduction of prior bad acts in State v. Jackson, 625 So.2d 146, 148-149 (La.1993):
Generally, evidence of other acts of misconduct is not admissible; however, there are statutory and jurisprudential exceptions to this rule. One exception is when the evidence of other acts tends to prove a material issue and has independent relevance other than showing that the defendant is a man of bad character. Even if independently relevant, the probative value of such evidence must be weighed against its prejudicial effect. LSA-C.E. art. 403; State v. Germain, 433 So.2d 110 (La.1983); State v. Thompson, 532 So.2d 1160 (La. 1988); and State v. Silguero, 608 So.2d 627 (La.1992). Evidence of other acts is allowed to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." LSA-C.E. art. 404(B)(1). One of these factors must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible.
The State is required to prove that the defendant committed these other acts by clear and convincing evidence. State v. Davis, 449 So.2d 466 (La.1984); LSA-C.E. art. 1103. The state must, within a reasonable time before trial, provide written notice of its intent to use other acts or crimes evidence and describe these acts in sufficient detail. Likewise, the state must show that the evidence is neither repetitive nor cumulative, and is not being introduced to show that the defendant is of bad *1156 character. The court must, at the request of the defendant, offer a limiting instruction to the jury at the time the evidence is introduced. The court also must charge the jury at the close of the trial as to the limited purpose for the other crimes evidence and that the defendant cannot be convicted for any crime other than the one charged or any responsive offenses to it. State v. Prieur, [277 So.2d 126 (La.1973)].
The fact that the other acts or crimes happened some time before the offense for which the defendant is on trial is not sufficient, in and of itself, to require the exclusion of the evidence. Remoteness in time, in most cases, is only one factor to be considered when determining whether the probative value of the evidence outweighs its prejudicial effect. Generally, a lapse in time will go to the weight of the evidence, rather than to its admissibility. State v. Cupit, 189 La. 509, 179 So. 837 (1938); State v. Bolden, 257 La. 60, 241 So.2d 490 (1970); State v. Howard, 520 So.2d 1150 (La.App. 3rd Cir.1987), writ denied, 526 So.2d 790 (La.1988); State v. Driggers, 554 So.2d 720 (La.App. 2d Cir.1989).
In summation, for the evidence to be admissible, the state must comply with the notice requirements and limiting instructions set out in Prieur, prove with clear and convincing evidence that the other acts or crimes occurred and were committed by the defendant, demonstrate that the other acts satisfy one of the requirements listed in LSA-C.E. art. 404(B)(1), and, finally, show that the probative value of the evidence outweighs its prejudicial effect.
In the present case, there is no dispute that the state timely gave notice of its intent to use such evidence. An evidentiary hearing was held on the matter and the trial court determined the evidence would be admissible at trial. The state sought introduction of the evidence to show that the defendant had a specific intent to kill and inflict great bodily harm on the victim. Such evidence was relevant as the defendant contended that the shooting was accidental.
The defendant contends that the trial court erred in admitting such evidence because of the lapse of time between the present offense and the prior acts. He suggests that the alleged past incidents of abuse are too remote from the present offense to be relevant. However, as the Supreme Court noted, the lapse of time between the present offense and the prior acts should go to the weight of the evidence rather than its admissibility.
In Jackson, the Supreme Court concluded that prior acts which occurred fifteen to twenty years before the offenses for which the defendant was on trial were admissible to show specific intent and plan. The defendant was on trial for the molestation of his granddaughters. The court determined that the state could introduce testimony from the defendant's daughters of similar acts of molestation which occurred while the daughters were of pre-pubescent age. At the Prieur hearing, the daughters gave specific details of the prior acts. The court stated that the
"[l]ength of time between the offenses should not exclude otherwise admissible evidence unless the lapse strips the testimony of probative value. While there must be some connexity between the crime charged and the other acts or crimes, the mere passage of time will not necessarily defeat admissibility. However, such a determination must be made on a case by case basis taking into account the peculiar facts of every individual case with much discretion given to the trial judge." Jackson, 625 So.2d at 151.
The state proved the prior beatings and threats by clear and convincing evidence. The testimony of the victim's daughter and sister established the incident of the baseball bat beating. The victim's daughter, who lived with the defendant and the victim for ten years, also testified as to other incidents of abuse and threats. Even Milton, Jr., who stated he loved his mother and father, acknowledged that his father beat and threatened his mother on numerous occasions. Ms. Brion, a friend of the victim's, testified to seeing the defendant beat the victim while she was pregnant. Ms. Brion also related an incident when the defendant threatened to kill the victim if she did not let him in her house. These incidents occurred from 1979 to the present time. Any lapse in time between *1157 these prior acts and the present offense should go to the weight of the evidence. As the state met its burden under Prieur, the trial court did not err in admitting into evidence the testimony concerning the defendant's prior acts of abuse and threats against the victim. This assignment of error is without merit.

C. Assignment of Error No. 2

The defendant also argues that the trial judge erred when he charged the jury that the jury could rely on any evidence of the other batteries which it found had been proven by "clear and convincing" evidence rather than "beyond a reasonable doubt."
In its charge to the jury on evidence of prior bad acts committed by the defendant, the court stated:
Evidence of alleged other crimes committed by the defendant has been introduced to you. If you find clear and convincing evidence that these other crimes were committed, and that the defendant was connected to them, then the law permits the purpose to which you may put this evidence and the conclusions you may draw from it. Excuse me. If you find clear and convincing evidence that these other crimes were committed, and that the defendant was connected to them, then the law limits the purpose to which you may put this evidence and this evidence to conclude that the defendant is prone to crime or a bad man. You may not conclude that simply because he may have committed another crime he must have committed or should be convicted of this offense. You may not convict the accused of any crime other than the one charged or one responsive to that charge. You may use the evidence of other crimes to draw conclusions concerning the defendant's intent or special knowledge or the absence of mistake...
The trial court had previously charged the jury that the state has the burden to prove the defendant's guilt beyond a reasonable doubt. The court stated:
The burden, therefore, is upon the State to establish to your satisfaction and beyond a reasonable doubt the guilt of the defendant as to the crime charged. If you entertain a reasonable doubt to any fact or element necessary to constitute the guilt of the defendant, it is your sworn, duty to give him the benefit of that doubt and return a verdict of not guilty. But this doubt must be a reasonable one, that is, one founded upon a real, tangible basis and not upon a mere caprice, fancy or conjecture. It must be such a doubt as would give rise to an uncertainty raised in your mind by reason of the unsatisfactory character of the evidence. And if the State has proved the guilt of the defendant to your satisfaction and beyond a reasonable doubt you should return a verdict of guilty.
The state's burden under Prieur was to prove the existence of other acts by clear and convincing evidence. Once the state met this burden, the trier of fact was allowed to use the evidence of prior acts in determining whether the defendant had the specific intent to kill or inflict great bodily harm. The jury was properly instructed that the state still had the burden of proving all elements of the offense charged, including specific intent, beyond a reasonable doubt. There was no error in the trial court's charge to the jury. This assignment is without merit.

D. Assignment of Error No. 3

In this assignment, the defendant alleges that the trial court erred in charging the jury that if it found the elements of the crime charged to have been proven, the jurors were bound to return a verdict of guilty as charged.
In the portion of the jury charge of which the defendant complains, the trial court was explaining to the jury the elements of the crime of second degree murder and its responsive verdicts.
Second degree murder is the killing of a human being where the offender has the specific intent to kill or to inflict great bodily harm. So, if you find that the defendant killed the victim, that he did so with the specific intent to kill, or to inflict great bodily harm, and that this took place in this parish on or about the date specified in the Bill of Indictment, then you *1158 shall find the defendant guilty of second degree murder.
The second verdict responsive to this charge is that of manslaughtereither passion manslaughter or what might be called statutory manslaughter. You will be informed of each in its turn.
Heat of passion manslaughter is the killing of a humand (sic) being when the offender has the specific intent to kill or to inflict great bodily harm, but that intention is conceived under some passion of heat of blood caused by some immediate provocation sufficient to deprive an average person of his self control and cool reflection. Please note what is required. The defendant must have actually killed the victim and done so with a specific intent to kill or inflict great bodily harm. However, what distinguishes this crime from that of second degree murder is that the killing must be done in some sudden passion or heat of blood that caused the defendant to lose control of himself. This sudden passion must have been caused by something which would have caused an average man to lose his self control as well. And further, you must also consider the interval between the provocation and the killing. You must find that the defendant did not actually recover his self-control during that interval and also, that a reasonable man would not have recovered his self-control during a similar interval.
Statutory manslaughter takes place when a homicide is committed without any intent to cause death or great bodily harm when the offender is engaged in any intentional misdemeanor directly affecting the person. Such a misdemeanor affecting the person would be aggravated assault.
An assault is an intentional attempt to use force or violence upon the person of another of the placing someone in danger of having force or violence intentionally used upon them. An assault is aggravated when it is committed with a dangerous weapon. A dangerous weapon is one in which the manner used is likely to cause death or great bodily harm.
So, if you find that the defendant killed the victim and that he did so with the specific intent to kill or inflict great bodily harm, and that this killing occurred in some sudden passion or heat of blood which actually deprived the defendant of his self control and cool reflection as a result of some provocation that would have caused an average person to lose his self-control as well, and that in the interval between the provocation and killing the defendant did not regain his self-control, nor would an average person have regained their self-control, and that this took place in this parish on or about the dates specified in the bill of Indictment, then you shall find the defendant guilty of manslaughter. Or, you have to find the defendant actually killed the victim and that he did so during the commission of an aggravated assault, and of course, that this took place in this parish of Orleans on or about the date specified in the Bill of Indictment, then you shall find the defendant guilty of manslaughter, also.
The third verdict responsive to this charge is that of not guilty.
The defendant contends that the trial court should have used the word "may" in place of the word "shall." He argues that the use of the mandatory "shall" did not allow the jury to find the defendant guilty of a lesser verdict. A jury charge must be considered as a whole, and particular expressions in a charge must be considered in the context of the entire charge. State v. Walters, 582 So.2d 317 (La.App. 4th Cir.1991), writ denied, 584 So.2d 1171 (La.1991).
The use of the word "shall" by the trial court did not bind the jury to find the defendant guilty of second degree murder. A review of the jury charge reveals that the trial court instructed the jury that it should render a verdict supported by the evidence. If the evidence supported a verdict of guilty of second degree murder, then the jury should render such a verdict. However, if the evidence supported manslaughter, the jury should render a verdict of guilty of manslaughter. This assignment of error is without merit.

*1159 E. Assignment of Error No. 4

The defendant further argues that insufficient evidence exists to justify the jury's verdict. When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. R.S. 15:438. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
La.R.S. 14:30.1(A)(1) defines second degree murder as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. While there was no eyewitness to the shooting, the defendant himself admitted he handled the gun. Only the defendant and the victim were in the bedroom at the time of the shooting. The coroner testified that the victim died of a single gunshot wound to the head. Dr. Newman, the coroner, and Officer Leary, an expert in firearms examination, stated that the stippling marks on the victim's head revealed that the gun was held approximately two and one-half feet to three and one-half feet from the defendant. The defendant's son, Milton, Jr., testified that his father admitted to shooting his mother, but claimed it was an accident. The defendant told Milton that he was turning the gun when it discharged and struck the victim. Milton, Jr. discounted the defendant's story, stating that the shooting was not an accident. The gun was not cocked when he had seen the gun earlier. The defendant had to cock the gun. Officer Leary's testimony that the weapon could not be discharged accidently because the gun has an internal hammer block supports Milton, Jr.'s statement. The only way to discharge the weapon is to pull the trigger.
Further, the defendant gave differing accounts of the shooting. He told Officer Talley that he accidentally shot his wife. After calming down, the defendant told Officer Talley the weapon discharged when he placed it on the nightstand. The defendant told Officer Zapata that he and the victim were arguing. He wanted to scare the victim so he picked up the gun and slammed it on the nightstand, at which time it discharged. Officer Clogher testified that the defendant told him the gun fell to the floor and discharged. A few days after the shooting, the defendant told Milton, Jr. and Kimberly Johnson that he picked up the gun because he heard something outside. When he picked up the gun, it went off accidentally. When presented with such conflicting testimony, the jury would be well within its discretion in choosing not to accept the defendant's theory of an accidental shooting.
In addition, as stated above, the testimony of Officer Leary discredits the defendant's theory of an accidental shooting. The state produced other witnesses to discredit the defendant's argument that the shooting was accidental. The state introduced evidence of prior instances of beatings and threats made by the defendant against the victim. This evidence was introduced to show that the defendant had the specific intent to kill or inflict great bodily harm. The victim's sister, Sheila Craig, the victim's children, Kimberly Johnson and Milton Williams, Jr., and the victim's friend, Linda Brion, gave substantial and detailed testimony as to the beatings and threats the victim underwent at the hands of the defendant. Milton, Jr. testified that he heard the defendant tell the victim, not even ten minutes before she was shot, to leave him alone or he would have to hurt her. Such *1160 evidence is more than sufficient to prove the defendant's guilt beyond a reasonable doubt. This assignment is without merit.
For the reasons discussed, the defendant's conviction and sentence are affirmed.
AFFIRMED.