809 So.2d 1261 (2002)
STATE of Louisiana
v.
Lawrence Herman REED.
No. 00-1537.
Court of Appeal of Louisiana, Third Circuit.
March 6, 2002.
*1262 James C. Downs, District Attorney, Sheryl L. Laing, Assistant District Attorney, Alexandria, LA, counsel for State of Louisiana.
Amy C. Ellender, Louisiana Appellate Project, Mer Rouge, LA, counsel for defendant Lawrence Herman Reed.
Court composed of NED E. DOUCET, JR., Chief Judge, BILLIE COLOMBARO WOODARD, and ELIZABETH A. PICKETT, Judges.
DOUCET, Chief Judge.
Defendant, Lawrence Herman Reed, was indicted on October 28, 1999, for second degree murder, a violation of La.R.S. 14:30.1. Defendant filed a motion to suppress certain statements made to the arresting authorities. The motion was argued to and denied by the trial court on April 3, 2000. A trial by jury commenced on April 5, 2000, and on April 6, 2000; Defendant was found guilty as charged. On May 1, 2000, Defendant was sentenced *1263 to the mandated sentence of life at hard labor, without benefit of parole. The trial court ordered Defendant be given credit for time served. Defendant did not object to the sentence at the time of the sentencing hearing, nor did Defendant file a written motion to reconsider the sentence. Defendant appeals arguing three assignments of error: (1) The evidence was insufficient to sustain the conviction of second degree murder; (2) The trial court erred when it denied his motion to suppress certain statements; and (3) The sentence is constitutionally excessive under the circumstances.

FACTS:
On the morning of September 13, 1999, Defendant killed the victim, Yvonne Smith, with one blast from a shotgun. The circumstances will be discussed in Defendant's Assignment of Error Number One.

ASSIGNMENT OF ERROR NO. 1, SUFFICIENCY OF THE EVIDENCE:
In his first assignment of error, Defendant alleges that the evidence was insufficient to sustain the verdict of second degree murder. Specifically, the Defendant argues that the State failed to prove beyond a reasonable doubt that the Defendant possessed the requisite specific intent to kill the victim.
The law applicable to a Jackson review, i.e., a claim by a defendant that the evidence presented at trial was insufficient to convict him of the crime which he stands convicted, was reviewed by this court in State v. Lambert, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98); 720 So.2d 724, 726-27, wherein this court stated:
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See King, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983).
In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. The Defendant's conviction was based entirely on circumstantial evidence.
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a purely separate test from the Jackson sufficiency standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Carmouche, 508 So.2d 792 (La. 1987); State v. Garcia, 483 So.2d 953 (La.1986). It is not the function of an *1264 appellate court to assess credibility or reweigh the evidence. State v. Stowe, 93-2020 (La.4/11/94), 635 So.2d 168.
State v. Cummings, 95-1377, p. 3 (La.2/28/96); 668 So.2d 1132, 1134.
Defendant was convicted of second degree murder in violation of La.R.S. 14:30.1, which provides, in pertinent part that:
A. Second degree murder is the killing of a human being;
(1) When the offender has a specific intent to kill or to inflict great bodily harm.
Early Monday morning, at approximately 5:45 a.m., Jerome Davis, an officer with the Alexandria Police Department, received a phone call regarding a shooting on Southland Street in Alexandria. Upon arriving at the scene, the officer found the victim lying in a small hallway of a house owned by Defendant. After determining that the victim was dead, the officer secured the scene and called for a crime scene investigator. As the officer waited for an ambulance, Defendant walked up to the house. The officer asked him who he was "and he said, I'm the one who did it." Officer Davis arrested Defendant and placed him into the patrol car.
Shortly thereafter, Detective William Bates, a crime scene investigator with the Alexandria Police Department, arrived at the scene. Detective Bates testified that he found the victim lying in a short hallway, with her heels at the entrance to a bedroom, her head lying in the doorway of the living room. Resting on the victim's right hand was a clothes iron. The cord of the iron was under her body. On the living room floor, the detective found an old shotgun with a piece of the stock missing. The detective found the missing piece in the bedroom. The detective concluded the shotgun was fired from the bedroom and that when the gun was fired a piece of the stock broke off. The shotgun was then dropped onto the floor in the living room.
The detective testified that the shotgun was an old twelve gauge, single-shot shotgun and that "[t]o fire it, just pulling the trigger it wouldn't fire, you'd actually have to cock the hammer on it and cock it back and then once it was cocked back, you could pull the trigger and it would fire." Once the shotgun was cocked, it would take only a very light pressure on the trigger to fire the gun. The detective examined the shotgun. He stated that the stock was loose from the receiver (the part of the gun which holds the trigger assembly and to which the barrel is attached) and cracked before the shotgun was fired. The detective stated that while he was in the bedroom he noticed that the bedroom window was broken and a garden hose was hanging in the window. He also noticed that the bed was wet.
Dr. Steven Cogswell, a forensic pathologist with the Bossier City Laboratory, conducted an autopsy on the victim. Dr. Cogswell testified that from examining the angle of the entry and exit wound and the type of wound caused by a shot striking and entering the skull, and by examining the pattern of the buckshot and blood splatters on the walls behind the victim, he was able to determine that the end of the barrel of the shotgun was between one and one-half feet to four feet from the victim's head when it was fired. He testified the shotgun was probably held by the shooter somewhere between his hip and his arm pit when it was fired. Dr. Cogswell stated the buckshot struck the victim's head at a height of 52 inches from the floor, skimming the left side in the area of the temple, literally evacuating the upper portion *1265 of the brain from inside the skull. The shot pattern struck the wall, which was one to one and one-half feet behind the victim, at a level of 63 inches from the floor indicating the shotgun had been aimed in an upward direction at the time it fired. The doctor further testified that he found no evidence of gunshot soot or powder burns on the victim's hands or arms.
The doctor testified that a six-foot cord from a clothes iron which was on top of the victim's hand was lying stretched out under the victim's body.
Doctor Cogswell also testified that the victim's blood ethanol level at the time of death was .08 percent and that a urine drug screen tested positive for cocaine. The doctor stated that the victim could have ingested cocaine any time from twenty-minutes up to three days before she was shot. He also testified that a glass crack pipe was found among her personal effects.
Defendant testified that on the morning of the incident, at approximately 4:45 a.m., the victim woke him by banging on his bedroom window. She demanded to be let in. Defendant testified that the victim had lived with him for about four months, but she had moved out two weeks prior to the shooting. He stated that during that two-week period, the victim returned to the house a number of times to harass Defendant for various reasons. This particular morning the victim wanted to come into the house to get some of her belongings she had left behind. Defendant testified that he had taken most of her belongings to her mother's house the preceding Sunday; all that was left was in a clothing basket in the front room. Defendant said he told her to leave and to come back later in the morning. A few minutes later, the victim broke the bedroom window and stuck a garden hose in the window and sprayed Defendant while he was in bed. He went to the front door and yelled at her to leave. In response, she turned the hose up full blast. Defendant stated he sat for a while until he could not stand hearing the water run any longer and went to the door. At that time, she pushed her way into the house. Defendant went outside and turned off the running water.
Defendant testified that when he went back inside, the victim ran around the house swearing at him and making demands. He stated that when he agreed with her to try and get rid of her, she would drop it and make another demand.
A. She made attempts to getlike she was going to get the meat. But looked like she seen that wasn't going to bother me. Looked like she would do things that she know would bother me. And she could have had all the meat. I didn't care. And since that wasn't bothering me, she shut the refrigerator and told mewell, she used profanity again.
He stated that he twice took her by the arm and walked her to the door in attempts to make her leave and both times she broke away from him. Finally, while standing in the kitchen, Defendant testified that she struck him with a clothes iron on the back of his shoulder.
A. From past experience, I know that anything she grab, she will use it. So when I seen her grab it and she raised it up, I ducked. I leaned to the side like this. Instead of hitting in the head, she hit me on my shoulder. Back part.
At that point, Defendant stated that he ran into his bedroom and grabbed the loaded shotgun, which was beside his bed, on the floor, and cocked it. Defendant testified that he intended to shoot it close enough to *1266 her to scare her. He stated that had the victim stayed in the kitchen he was going "shoot the cabinet off the damn wall." However, when he turned around, she was standing right there in the doorway. Defendant testified as follows:
In order to avoid from accidently shooting her, I wanted to make sure the barrel was passed her before I shot the gun. So I wanted to put the gun passed her. And as I went in an attempt to put the gun passed her, she brung [sic] the iron up, over and it hooked the gun so it kind of went forward toward her and it went off.
Defendant testified it was still dark and he could not see her well. He stepped over her and walked into the living room, where he saw her. He dropped the shotgun and fell to his knees in shock. He stated that after a few minutes he came to his senses and ran to his brother-in-law's house, which was a block away. There he told his sister to call the police.
In his brief, Defendant argues:
Because there was no direct evidence that Lawrence Reed had the specific intent to kill or inflict bodily harm upon Yvonne Smith, and in fact because he specifically denied that he had such an intent the State was forced to rely on circumstantial evidence. The circumstantial evidence presented at trial does not exclude the reasonable hypothesis that Mr. Reed intended to fire the shotgun only to obtain Smith's attention so that she would realize he was serious about ending the altercation and wanted her to leave his home.
Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10. Specific criminal intent may be inferred from the circumstances present in the case and the actions of Defendant. State v. Broussard, 560 So.2d 694 (La.App. 3 Cir.), writ denied, 566 So.2d 981 (La.1990).
In the instant case there are two circumstances from which the jury could have inferred specific intent: that the victim was shot at close range and that the victim and Defendant were involved in an altercation at the time of the shooting. This court has stated that the act of aiming a firearm directly at a victim is indicative of intent to kill the victim. State v. Clark, 93-1470 (La.App. 3 Cir. 10/5/94); 643 So.2d 463, writ denied, 94-2715 (La.1/9/95); 649 So.2d 418. Furthermore, specific intent may be inferred when a wound is inflicted at close range. State v. Seals, 95-0305 (La.11/25/96); 684 So.2d 368, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). However, although the jurisprudence supports the proposition that specific intent can be inferred from the fact that the victim was shot at close range, that jurisprudence relies on the support of other circumstances indicating specific intent. "The jury should not be permitted to believe that just because someone is killed, the law regards it as a reasonable inference that someone intended to harm him." State v. Davis, 411 So.2d 2, 6 (La.1982).
In State v. Williams, 93-2707 (La.3/11/94); 633 So.2d 147, the supreme court found Defendant's account of an accidental shooting "so remote and unlikely that it failed to provide jurors a hypothesis of innocence they could not reasonably reject." Id. at 149. Williams and his wife, the victim, were alone, outside, when the shooting occurred. Defendant testified *1267 that because they had been robbed a short time prior to the incident, he had borrowed a gun and was showing his wife how to use the gun when it accidently discharged. The bullet struck her square in the forehead, right between her eyes. However, between the time Williams first talked to the police and the time he was charged with second degree murder, he gave three different accounts of how the shooting occurred. In Williams the supreme court stated:
The state's case for specific intent homicide rested, however, on more than the inferences arising from the conflicting statements given by Defendant. The prosecution's physical evidence directly contradicted the final exculpatory account of an accidental shooting offered by Defendant at trial. Compare State v. Savoy, supra [418 So.2d 547 (La.1982) ]. The findings of the pathologist gave jurors a rational basis for concluding that the gun could not have discharged in the way that Defendant described and that considerable, deliberate care had been taken to position the weapon exactly in the center of the victim's forehead and precisely level just before it fired. From that objective evidence, and without any other evidence of his intent but Defendant's discredited version of an accidental shooting, jurors could rationally infer that he fired a bullet through the brain of his victim with the specific intent to hill her. Cf., State v. Williams, 383 So.2d 369 (La.1980); State v. Procell, 365 So.2d 484 (La.1978).
Id. at 149.
In State v. Savoy, 418 So.2d 547 (La. 1982), the supreme court overturned Savoy's conviction for second degree murder. Savoy alleged self-defense. Hers was the only testimony as to the events as there were no eyewitnesses; the evidence was entirely circumstantial. The supreme court stated:
Viewing the evidence in a light most favorable to the prosecution, a rational juror might conclude that Savoy fired the shot with the specific intent to kill or to do great bodily harm. However, none of the physical evidence bears on whether or not Francis Sam, Jr. attacked Ms. Savoy on the night of February 10neither the trajectory of the bullet, nor the distance from which the bullet was fired, nor the fact that the victim's knife was found in the truck (and not on the porch), nor the fact that Savoy did not appear to have been in a strugglenone of these facts is inconsistent with the reasonable possibility of self-defense.
The addition of testimonial evidence does not solve the matter for the State. We grant that Savoy was shown to be a consummate liar through the testimony of several policemen who recounted the various conflicting scenarios told by Defendant. But even the total destruction of Savoy's credibility does not entail the creation of affirmative, substantive evidence which weighs on the side of the State. Without such evidence, the State cannot be held to have proved lack of self-defense beyond a reasonable doubt.
In the absence of circumstantial evidence to prove Defendant's guilt, that is, the lack of self-defense, we are left with only Defendant's various accounts. The most that any juror could rationally conclude was that Defendant was lying, and that no one except Defendant will ever know to a moral certainty, we must find no rational juror could have regarded the State as having proved its case beyond a reasonable doubt.
Id. at 550-551. (Emphasis in original).
In State v. Williams, 95-0579 (La.App. 4 Cir. 4/10/96); 672 So.2d 1150, writ denied, *1268 96-1180 (La.11/11/96); 682 So.2d 759, the fourth circuit found that the state had met its burden of excluding the reasonable hypothesis of an accidental shooting. There was no witness to the shooting and Defendant's conviction was based primarily on the inference of his specific intent to kill his wife. Not only had Williams' version of the event changed several times, but the state introduced evidence of prior beatings and threats made by Williams toward the victim. Furthermore, an expert in firearms testified that the weapon could not have accidently discharged when it was dropped on the floor as testified to by Defendant. The expert explained that the wound in the victim's head was of a type that could have only resulted from a shot fired from two and one-half feet to three and one-half feet away. Defendant's son also testified that he was the last one to handle the weapon before the shooting, and when he returned it to his father's night stand, the weapon was not cocked.
In the instant case, unlike Williams, 633 So.2d 147 and Williams, 672 So.2d 1150, the pathologist did not testify that the gunshot wound was of the type that would exclude the possibility of an accidental discharge as described by Defendant. However, other forensic evidence, i.e., the angle of the blast, the lack of soot or "powder burns" on the victim's hands or arms, the position of her body, and blood on the handle of the clothes iron, which Defendant claims the victim had been holding at the time the shot was fired, appears to discount an accidental discharge.
The second circumstance from which the jury could have inferred intent was the fact that Defendant and the victim were arguing at the time of the shooting. As discussed above in Williams, 672 So.2d 1150, the state met its burden of proof by introducing evidence of prior violent arguments between the couple. In Williams, there was detailed and substantial testimony as to the violence the victim underwent at the hand of Defendant. In the instant case, when asked at trial whether he and the victim had a history of fights, Defendant testified that one of the reasons he wanted to break up with her was that "[s]he would constantly go out and come back wanting to fight causing arguments." At trial, Defendant testified that he was convicted in 1992 for a simple battery and convicted for misdemeanor possession of drug paraphernalia in 1998.
Defendant testified that this was not the first time the victim had come to the house and harassed him. Nor was this the first time she had struck him.
Unlike Williams, 633 So.2d 147 and Williams, 672 So.2d 1150, in the instant case, Defendant did not give contradictory statements as to how the shooting happened. The only variation between Defendant's statement given to the police two hours after the event and his trial testimony was that he made no mention of the role the clothes iron played. Daryl Terry, a crime scene investigator with the Alexandria Police Department, testified that he was the officer who advised Defendant of his rights. He asked for and received from Defendant his permission to search and seize, if necessary, anything from the residence. He stated Defendant was very cooperative. Detective Terry accompanied Defendant to the station and conducted the interview. Detective Bordelon was present during the interview.
Detective Terry's account of what Defendant told them and the transcribed statement was consistent with Defendant's testimony at trial other than the Defendant said nothing in his statement to the *1269 police officers about the clothes iron. In his recorded statement to the detectives, Defendant stated, "I turned around and as soon as ... she right there. She grabbed the mother f[---]er man." Defendant further testified:
A. At that moment, I'm going to tell youI'mThe autopsy and stuff came back, I was still trying to figure out what went wrong. I knowI know she had hit the gun; I didn't know with what. I thought she had grabbed it at first. I didn't know. All I know is somehow she grabbed the gun and pulled it toward her and it went off. That's all I knew.
However, the pathologist testified that he found no evidence of gunshot soot on the victim's hands or arms. The pathologist testified that if the victim grabbed the barrel with her hand she would likely have searing or charring of the hand. If the victim grabbed the barrel slightly back from the muzzle, there very likely might be gunshot soot deposited on either of the forearms. At trial, Defendant testified that the victim somehow hooked the barrel of the shotgun with the clothes iron she had in her hand. The State pointed out to Defendant that at the time he made the statement to the officer, he did not tell them about the clothes iron. Defendant explained that the officers cut him off as he was telling them about the confrontation and said "just go to where the gun came into play at. So at that point that's what I did."
In its brief, the State argues that "[t]he iron in question had blood on the handle which would have been the logical place for Ms. Smith to have been holding it. Defendant could offer no explanation for this phenomenon." At trial, when asked about how the blood splatters came to be on the handle of the iron, Defendant said he did not know. In brief, however, Defendant argues:
[I]t is reasonable to conclude that Smith could have dropped the iron upon impact and as it fell to the ground it obtained blood stains from the massive destruction that was evident in the photographs. The presence of the iron on top of Smith's hand does tend to corroborate Mr. Reed's testimony that she was in pursuit of him and also lends credibility to his decision to arm himself with his shotgun in order to fire a warning shot.
(Emphasis in original). There was no other testimony explaining the blood splatters on the handle of the clothes iron.
The State further argues had the victim been swinging the iron, the cord would not be stretched out straight behind her. At trial, the pathologist testified that the cord most likely would not have been found lying on the floor under the victim had she been swinging the iron. However, the pathologist admitted that there were many variables that could have resulted in the cord of the iron ending up lying underneath the victim's body. We note that photographs of the crime scene demonstrated that the victim was mortally wounded on the left side of her head. The iron was found on top of her right hand which was extended outward from the right side of her body.
Photographs of the crime scene also show that the victim fell backwards when she was shot. During examination by the State, Dr. Cogswell, the forensic pathologist assigned to the case, testified that contrary to popular belief, based upon what one sees in movies and on T.V., people do not "go flying across the room and *1270 hit the wall" when they are shot. He stated that when they "get shot ... they fall down in whatever direction their center of balance lets them fall." He continued: "Its much less likely that she was leaning forward because if she was leaning forward, she would be more likely to fall forward."
Defendant cites State v. Hardeman, 467 So.2d 1163 (La.App. 2 Cir.1985). In Hardeman, the second circuit affirmed Hardeman's conviction for second degree murder. Hardeman had accused the victim of stealing a gun from him. As the victim walked away, he called to Hardeman, "old man you'll get a pistol." Id. at 1170. Hardeman shot the victim in the back as the victim was walking away. Defendant alleged that he knew the victim had a gun on him because everyone in that locality carried a gun. The second circuit set forth factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary: (1) the excitement and confusion of the situation, (2) the possibility of using force or violence short of killing, and (3) the party's knowledge of the assailant's bad character. Defendant argues that "[b]y analogy, these same factors can be used in evaluating whether Mr. Reed's actions of using the shotgun as a warning device were justified."
Mr. Reed explained several times during the trial that Smith knew Mr. Reed would not do anything to stop her aggressive fighting behavior because it had happened so many times in the past. Smith had pulled knives and even the exact shotgun previously in an attempt to threaten Mr. Reed. (R. 112) In addition, Smith had struck Mr. Reed on three prior occasions. (R.103) Because Mr. Reed had spent time in jail only two months prior to this incident, he knew he did not want to do anything that would jeopardize his freedom. (R. 97, State Ex. 3, p. 8) Smith knew this. She was not afraid to be aggressive, especially while she was acting with an altered state of mind such as on September 13, 1999. For these reasons, Mr. Reed knew he needed to be convincing about [his] desire for her to leave. Thus, he decided to use the shotgun as a weapon of warning. This behavior, although not the best course of action in hindsight, was justified according to the criteria used State v. Hardeman, supra. [467 So.2d 1163 (La.App. 2 Cir.1985) ]
In the instant case, Defendant argues that the shooting was accidental. Additionally, he argues that he lacked the requisite specific intent necessary for second degree murder. Defendant contends his actions did not indicate a guilty state of mind in that he immediately reported the shooting and he was cooperative with the police at all times. He argues that he was desperate to end an ongoing bad situation with the victim and that his version of the events leading up to the shooting were substantiated by the physical evidence. He further argues that the presence of the clothes iron on the victim's hand supported his contention that she had struck him with the clothes iron and that the clothes iron was in her hand when she entered the bedroom. He argues that she struck the gun with something, possibly the clothes iron, thus causing the accidental discharge of the shotgun, which could explain why the victim did not have gunshot soot on her hands or arms.
At trial, Defendant admitted to the shooting. He testified that she started the altercation. This was supported by the broken window, the garden hose hanging *1271 through the window, and the wet bed. While Defendant testified that he was having problems with the victim, there was no corroborating testimony or evidence offered to this effect. Defendant's statement to the police is basically consistent with his trial testimony, except for the deletion of the clothes iron. Defendant testified that the shotgun discharged when the victim struck it. Other than the detective's testimony that the shotgun was easy to fire when cocked, there was no testimony whether the shotgun could have accidently discharged. Defendant immediately called the police and was cooperative throughout the investigation.
The State argues in its original and supplemental briefs that Defendant's versions of the facts are inconsistent, in that he did not tell the police of the role of the clothes iron at the time he made the statement, two hours after the shooting. The State further argues that because there were blood splatters on the handle of the clothes iron, the victim could not have been holding the clothes iron at the time of the shooting, and because the cord of the clothes iron was found under the victim's body, she could not have swatted at the shotgun with the clothes iron.
Additionally, the pathologist testified that the barrel of the shotgun was a distance of one and one-half feet to four feet away from the victim and held between the hip and the armpit of the shooter, aimed in an upward direction at the time it discharged, and that the shot skimmed the left side of the victim's head. He further testified that no gunshot soot or powder burns were found on the victim's hands or arms. These facts appear to contradict Defendant's claim that he was trying to get the barrel of the shotgun past the victim, before firing, to keep from possibly hurting her.
Finally, the blood stains on the handle of the iron and the fact that the iron was on top of the victim's right hand, which extended out to the right from her body, the side opposite from her fatal wound, appear to contradict Defendant's claim that she swung the iron hitting the barrel of the shotgun and knocking it into position where the discharge struck her. Combining these facts with the forensic pathologist's testimony that, because the direction in which the victim fell (backwards), it was very unlikely that she was leaning forward when shot, the jury could have very well concluded that Defendant was not telling the truth.
Alternatively, Defendant argues that, at most, the facts warrant a conviction of manslaughter. La.R.S. 14:31(A)(1), defines manslaughter as:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
This court has held that "`[s]udden passion' and `heat of blood' are not elements of the crime of manslaughter. They are factors which mitigate against finding a defendant as culpable as a person who commits a homicide without the occurrence of any extenuating event." State v. Stewart, 00-143, p. 4 (La.App. 3 Cir. 1/4/00); 771 So.2d 723, 726. In Stewart, this court affirmed defendant's second degree murder *1272 conviction and found that defendant failed to prove by a preponderance of the evidence that he was acting in "sudden passion" or "heat of blood" to the taunts of his wife. Stewart testified that he intentionally got the gun and, in front of his wife, threatened to kill himself. When she said go ahead and do it, he shot her four times in the head. Likewise, in the instant case, Defendant testified that he picked up the shotgun with the intent to scare the victim. When asked why he did not just shoot out the window, he responded that she would have only laughed at him. He wanted to shoot close enough to her to scare her. However, unlike Stewart, Defendant testified at trial that the victim was the one who caused the shotgun to fire.
Defendant contends the shotgun discharged accidently. He testified repeatedly that he retrieved the shotgun with the intent to scare the victim sufficiently to make her leave him alone, but he had no intent to harm her. However, as discussed above, the facts do not appear to support his claim of accidental discharge. Neither do the facts appear to support that the victim's actions provided "provocation sufficient to deprive an average person of his self-control and cool reflection."
The record establishes that Defendant and the victim had lived together for some time prior to her death. Defendant testified that their relationship was somewhat stormy and that this fact led to its dissolution. Defendant also testified that he expected he victim to come to his house that morning. The victim who was five-feet-two-inches tall had cocaine in her system and a blood alcohol content of 0.08% at the time of her death. Defendant is a five-foot-ten-inch man. The jury apparently did not believe that any provocation of Defendant by the victim warranted him grabbing a loaded twelve gauge shotgun to frighten this diminutive woman. The jury verdict clearly shows that the members did believe that Defendant's shooting of the victim was "committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."
In sum, the case presented by the State convinces us that all the evidence, both direct and circumstantial was sufficient under Jackson to satisfy a rational juror that Defendant was guilty of second degree murder beyond a reasonable doubt. This assignment, therefore lacks merit.

ASSIGNMENT OF ERROR NUMBER 2:
By his second assignment of error, Defendant contends the trial court erred when it denied his motion to suppress the statement made to the police officers two hours after the incident. Defendant specifically alleges that the court erred in allowing the statement to be used at trial because prior to the statement he invoked his right to remain silent and even though "Mr. Reed told the officers he did not wish to give a statement, invoking his right to remain silent, the officers ignored this assertion of rights and continued to lead Mr. Reed into a statement."
The Louisiana Supreme Court held in State v. Robertson, 97-177 (La.3/4/98); 712 So.2d 8, 30, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998);
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court provided a person in custody must be given certain warnings before interrogation may commence in order to safeguard his *1273 Fifth Amendment right against self-incrimination. See also State v. Davis, 92-1623, p. 19 (La.5/23/94), 637 So.2d 1012, 1024, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359(1994). After these warnings have been given, if the individual indicates at any time that he wishes to remain silent, the interrogation must cease. However, when the protections provided by Miranda are not specifically invoked, police may continue to question the suspect in the hope of obtaining a statement. Green, 94-0887 [(La.5/22/95) ] at p. 10 n. 8, 655 So.2d [272] at 280, n. 8. For a statement which was obtained where an individual's right to remain silent was not invoked after being informed of his Miranda rights to be admissible, it is the State's burden to show defendant waived his right prior to speaking. Davis, 92-1623, at p. 19, 637 So.2d at 1024; Green, Id. The waiver must be knowing and intelligent under the totality of the circumstances which include the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Green, 94-0887 at p. 11, 655 So.2d at 280.
Detective Terry testified that he advised Defendant of his Miranda rights in Detective Davis's police car while they were still at the scene of the shooting. He testified that once Defendant arrived at the police station he was advised of his rights again, using the Alexandria Police Department right form. The following exchange took place:
Q. Okay Lawrence, in front of you I have an Alexandria Police Department Advise of Rights form. Is that correct? And I read the rights one through five to you. Did I read them to you earlier?
A. Yes.
Q. Did you initial your ... these are your initials and signed it stating that you understood your rights?
A. Yes.
Q. Then after you did that, I read the Waiver of Rights to you. Is that Correct?
A. Yea.
Q. And you signed stating that you understood the Waiver?
A. Right.
Q. Okay. Do you have any question about your rights?
A. No, I don't have no questions.
. . . .
Q. And it's my understanding that you want to give me a voluntary statement, is that correct, of what happened this morning? The way we talked just a minute ago?
A. I want ... I want to give ya'll a statement but I don't ... I'd rather not be doing it. Another time if we could man.
Q. Okay. When would you like to do it?
A. I don't' know (unable to understand) a couple of days. Two days or so. Two days or something.
Q. Okay Lawrence, we talked prior to taking the statement. Is that correct?
A. Yea.
Q. Okay and then I asked you about getting a recorded statement and you said it was okay at the time.
A. Yea.
Q. I ... just like I said, I just want to hear your details. You feel like telling *1274 me just your details? It's going to be short. I just want to know what happened down there. You were telling me about, she broke the window out and stuck the water hose in there and things like that. That's what I want to cover. You mind telling me that or not? I'm sorry?
A. (Unable to understand). We been having problems.
Defendant then proceeded to describe the events which led to the shooting.
At the hearing on Defendant's motion to suppress the statement, Defendant testified that he was never threatened in any way in order to get a statement, nor did he specifically ask for counsel. In fact, as the trial court pointed out, he said he wanted to give a statement, he just wanted to wait awhile. In Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court held that an unambiguous and clear assertion of the right to remain silent was necessary to trigger the rule that interrogation must cease upon invocation of the right. In Robertson, 712 So.2d 8, the Louisiana Supreme Court held that the defendant did not invoke his right to remain silent when he told the officers that he had nothing to say about the murders. Robertson never said he did not want to speak to the police at all, only that he had nothing to say. The supreme court noted:
The fact defendant continued to speak to police reflected an intent to continue the exchange, thus giving effect to the "fundamental purpose of ... Miranda," which was to "assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process."
Id. at 31, citing, State v. Green, 94-887 (La.5/22/95); 655 So.2d at 280, n. 8 [quoting Connecticut v. Barrett, 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987) ].
Accordingly, we find Defendant did not specifically invoke the right to remain silent and that he voluntarily and intelligently waived his right to remain silent under the circumstances. Thus, the trial court did not err when it denied Defendant's motion to suppress the statement. This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 3:
For his final assignment of error, Defendant alleges that his life sentence, although statutorily mandated, is excessive under the circumstances of this case. Defendant argues in the alternative that there was no strategic reason for defense counsel to have ignored the requirements of La.Code Crim.P. art. 881.1; he, therefore, received ineffective assistance of counsel.
As noted, Defendant did not make or file a motion to reconsider his sentence. Pursuant to Article 881.1, Defendant had thirty days from the date of sentencing to make or file a motion to reconsider. Absent a timely motion, this court is precluded from a review of the sentence on appeal. State v. Joubert, 97-1093 (La.App. 3 Cir. 2/4/98); 705 So.2d 1295, writ denied, 98-1525 (La.10/30/98); 723 So.2d 973.
However, inasmuch as Defendant raises allegations of ineffective assistance of counsel for failure to make or file a motion to reconsider his sentence, and the record before us enables us to do so, we will address this issue.
Courts are charged with imposing a statutorily mandated sentence unless it is unconstitutional. State v. Dorthey, 623 So.2d 1276 (La.1993). The assertion that a *1275 mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); State v. Hereford, 518 So.2d 515 (La.App. 3 Cir.1987).
This court held in State v. Judge, 99-1109 (La.App. 3 Cir. 3/1/00); 758 So.2d 313, that there could be a basis for an ineffective assistance claim if a defendant can show a reasonable probability that, had counsel filed or made a motion to reconsider the sentence, the sentence would have been different. This court stated in State v. Clements, 99-2005, p. 6 (La.App. 3 Cir. 10/4/00); 774 So.2d 263, 266, quoting State v. James, 95-962, p. 5 (La.App. 3 Cir. 2/14/96); 670 So.2d 461, 465 (emphasis in original): "[i]t is not enough for an accused to make allegations of ineffectiveness; the accused must couple these allegations with a specific showing of prejudice."
As noted above, the imposition of the life sentence at hard labor was mandatory, and Defendant failed to show by clear and convincing evidence he could have received a reduced sentence. Thus, Defendant has failed to show that, had defense counsel made or filed a motion to reconsider his sentence, there was a reasonable probability that the sentence would have been different. Accordingly, this assignment is without merit.

DISPOSITION:
Accordingly, for the reasons stated above, Defendant's conviction and sentence are affirmed.
AFFIRMED.