PITMAN, J.
| ^Defendant Jacorroyn Lavell Wilson was tried by a jury and found guilty of resisting an officer by force or violence and second degree murder. He was sentenced to three years at hard labor for the conviction of resisting an officer and to life imprisonment without the benefit of parole, probation or suspension of sentence for the conviction of second degree murder. For the following reasons, Defendant’s convictions and sentences are affirmed.
FACTS
The following facts are gleaned from the record and the October 27-29, 2015 trial transcript.
On May 1, 2015, at approximately 10:15 p.m., Dep. Lester McDaniel of the DeSoto Parish Sheriffs Office received a call to be on the lookout for a gray Buick Roadmas-ter which was of interest in a current investigation. Sometime later, Dep. McDaniel discovered the vehicle parked at the Seasons Apartments at 501 North Bo-gle Road in Logansport, Louisiana. Upon approaching the vehicle, he observed Defendant inside the car. He obtained Defendant’s state-issued identification card, and Defendant admitted to owning the car.
*1003 Dep. McDaniel attempted to handcuff Defendant after he made some incriminating statements,[1] but Defendant physically resisted, telling him that he was “not going back to jail.” The men fell to the ground, where Defendant punched Dep. McDaniel, bit him on the back, escaped detention and ran from the apartment complex into some nearby woods. Dep. McDaniel relayed the identity of Defendant to the DeSoto Parish 12Sheriff s Office and informed it that Defendant had engaged in a fight with him when he attempted to handcuff him and then Defendant fled the scene.
The next day, May 2, 2015, Dorothy Keel went to check in on her former boyfriend, Charles Worthington, who lived at 1077 Bogle Road, a residence located some blocks from the Seasons Apartments. Ms. Keel, who had recently moved out of Mr. Worthington’s home, had become concerned when he failed to respond to her text messages. When she arrived at his house, she noticed several abnormalities. There was trash in the front yard, her German Shepard was acting “funny” and the truck that Mr. Worthington had just purchased from his father had been driven into a fence and was still running. His work truck, a tan Ford F-150, was missing. Concerned that something had happened to Mr. Worthington, she walked up to the front porch where she noticed “a pile of blood” on the front steps and on the porch. The front door was open and she noticed Mr. Worthington lying on the floor next to the front door. She opened the door, called out his name and touched his forearm, but realized he was cold. She stated that she saw that a china cabinet had been turned over. There were items scattered all over the floor and the home looked as if it had been ransacked. She called 911 and told the operator that Mr. Worthington was dead. After his body was removed, she noticed that his cell phone, driver’s license, bank cards and wallet were missing.
One of the investigating officers, Sgt. Adam Ewing of the DeSoto Parish Sheriffs Office, testified regarding the investigation and identified some pictures of objects taken from the scene at Mr. Worthington’s house, including one of a “Little Pal” shovel that had blood on it. Sgt. Ewing referred to the shovel as a “very significant” item.
|SA few days after Mr. Worthington’s death, his brother, Ramon Worthington, who had taken his mother’s cell phone to purchase some minutes for it, received a phone call that appeared on the screen as being from his brother’s missing cell phone. He answered and a person told him he had found the telephone in Tyler, Texas, and asked what he wanted him to do with it. Ramon Worthington told the caller to turn the cell phone over to police because it was evidence in a murder investigation. The DeSoto Parish Sheriffs Office began working with law enforcement in Tyler to develop information on the case.
Dr. James Traylor performed the autopsy on Mr. Worthington and determined that the cause of death was blunt force trauma. Autopsy photographs were taken, which were eventually introduced as evidence at trial. Dr. Traylor found that the ■victim suffered many blows to his body, including two potentially fatal blows, one above his left eye and the other to his throat. The blow to Mr. Worthington’s head fractured his skull, and Dr. Traylor opined that the wound appeared to have been caused by the blade end of a bloody *1004 “Li’l Pal” shovel that was recovered by-police from Mr. Worthington’s home.
On May 3, 2015, Mr. Worthington’s missing Ford F-150 truck was found in Tyler, Texas. On May 12, 2015, Tyler Police Det. Greg Roberts received a tip from the Tyler — Smith County Crime Stoppers indicating that Defendant was staying with his former girlfriend, Robin Lovelace, at 2202 Loblolly Lane in Tyler. This location was only blocks away from where Mr. Worthington’s truck had been found. When police arrived at Ms. Lovelace’s home, her father, Freddie Sparks, helped police apprehend Defendant, who was hiding in the attic. Two days later, Mr. Sparks turned Lover a pair of boots to Tyler Police Investigator James Riggle.[2] The boots, size 10 ⅜ Polo brand boots, contained traces of Mr. Worthington’s blood and matched shoe impressions left at Mr. Worthington’s home. However, the boots did not contain sufficient DNA from any other individual, including Defendant, to make any other scientific conclusions regarding who else had been in contact with the boots;
On May 13, 2015, following his arrest in Tyler, Texas, Defendant was interviewed by Sgt. Randy Chaisson and Sgt. Travis Chelette, both of the DeSoto Parish Sheriffs Office. During the interview, Defendant confessed to killing Mr. Worthington.[3]
On June 11, 2015, Defendant was charged with one count of resisting a police officer with force or violence and one count of second degree murder, in that he killed Charles Worthington when he had specific intent to kill and while he was engaged in the. perpetration of an armed robbery.
On October 16, 2015, prior to trial, Defendant moved to suppress the interview on the basis that it was not freely or voluntarily made and was not an accurate recording of the interview due to technical problems with the recording. Specifically, Defendant pointed out that, on three separate occasions, occurring prior to his confession, he asked to terminate the interview. He alleged that the continuation of questioning by police following his requests to end the interview amounted to coercion, resulting in an involuntary statement. Additionally, portions of the audio content of the interview were not recorded. He argued that the failure in the | (¡recordation of the interview produced an incomplete record that should be suppressed.
On October 21, 2015, a hearing was held on the motion to suppress. Sgt. Chaisson testified that Defendant was advised of, and waived,[4] his Miranda rights prior to 'making a statement. He recalled that, during the interview, Defendant made reference three times to terminating the interview. However, he stated that he did not believe Defendant was clearly invoking his right to remain silent because he continued to answer questions. He opined that Defendant requested to end the interview at times when he was confronted with facts indicating his role in Mr. Worthington’s murder.
Sgt. Chelette likewise testified that Defendant did not unequivocally invoke his right to remain silent because he said only that “I would like to” or “I want to termi *1005 nate the interview.” Furthermore, Defendant continued to answer questions. He stated that the regular practice of the De-Soto Parish Sheriffs Office is to terminate an interview when a person clearly says, “I’m done talking. I want my attorney.”
After reviewing a copy of the audio recording of the statement,[5] the trial court denied Defendant’s motion to suppress,[6] explaining:
In any event, reviewing this entire statement, the Court is satisfied that this Defendant had the right, he just simply did not choose to exercise it. He said he wanted to terminate it but he was not forced to continue, the interview continued. The content of the statement makes it clear that at the times that he indicated a desire to terminate the interview, there was an awful lot of information that had not yet come out and once he started [(¡listening to that information there was never a second question or indication to terminate the interview after he actually began the content of his statement. Considering this statement on its whole, the motion to suppress is denied. And the motion to suppress [sic], by this Court is free and voluntary and admissible.
At trial, the state sought introduction of a redacted[7] version of the video recording of Defendant’s statement, as well as a transcript of the interview. Counsel for Defendant stated that there was “no objection” to either item and they were admitted into evidence. The video was then played in open court.[8] The video shows that, prior to any interrogation, Defendant was advised of his Miranda rights, which he waived. Thereafter, Defendant explained that he went to Logansport with his mother and her boyfriend to see his sister. When asked about the reason for their trip, Defendant mentioned his aunt and a telephone conversation between her and his mother. However, while describing the phone conversation, the audio on the recording of the interview briefly went out. Defendant stated that he drove his mother and her boyfriend to Logansport in a blue Buick Roadmaster, which belonged to his child’s mother. Once in Logansport, Defendant drove to his grandfather’s house, then the group went to his aunt’s house. The audio for the recording went out again when Defendant was telling police his aunt’s first name and when he mentioned his grandfather. Defendant then admitted going to the Seasons Apartments, by himself, to talk to his cousin. Defendant stated that, while he was there, “an officer pulled up on me and approached me and (audio stops) me so, I |7snatched away from him and that’s when we got into an altercation and I ran.”
Defendant admitted punching the police officer at the Seasons Apartments, but denied biting him. He stated that, after he escaped from the police officer, he ran into the woods and started walking back to Texas. He claimed to have left his shirt, boots and pants in the woods somewhere in Tyler. When the interviewers confronted Defendant about the fact that they believed that he drove, not walked, from *1006 Logansport to Tyler, Defendant stated that someone picked him up in Carthage, Texas. The following exchange then took place:
Q: Corrie, Corrie. We’re giving you an opportunity, okay? We’re giving you the opportunity—
Q: I mean I don’t want to put words in your mouth, okay? I know what happened. I want — no, listen to me, look—
A: No, y’all think y’all know what happened. Y’all don’t know what happened.
Q: Then tell us what happened. I’m wanting to get your story but you’re not telling us the whole thing, Corrie.
A: I’m trying to tell you.
Q: No, you’re not telling us the whole thing.
A: I’d like to terminate this interview.
Q: Well, just listen to me.
A: No.
Q: What kind of vehicle were you in?
A: A truck.
The interview continued and Defendant told police that a white male in a brown or tan truck picked him up in Carthage and dropped him off near Peach Park in Tyler. He stated that he thought about going to his sister’s |shouse, but was concerned that police would be there looking for him because he had gotten into a fight with a police officer. The interviewers then asked Defendant where he went and the following exchange occurred:
Q: But where did you go?
A: To a friend’s house.
Q: Okay. And who’s your friend?
A: I want to terminate this interview.
Q: I mean, I’m trying to help you out.
A: I know.
Q: I mean, this is what we’re doing. We’re trying to give you an opportunity. I mean, who’s your friend?
A: Just a friend.
Q: Okay. Just a friend?
A: Yes.
Q: Not an ex-girlfriend?
A: No.
The interview continued and Defendant stated that, after the man dropped him off in Tyler, he went to Whitehouse, Texas. The audio recording stopped when Defendant was telling police about going to Whitehouse. When asked to give a description of the man who picked him up in Carthage, Defendant said that the man had a “low cut perm” and was bigger than him. The audio of the recording then went off for a brief moment before Defendant stated that the man was wearing white clothes, like painter’s clothes.
Police then asked Defendant specifically where he went when he left the Seasons Apartments, and Defendant stated that he walked into the woods | aand kept walking until he got to Joaquin, Texas. The audio on the recording stopped briefly when Defendant was talking about walking to Joaquin. The police then confronted him with alleged video proof, from traffic cameras, that he did not walk from Logansport to Joaquin. Defendant admitted to being intoxicated when he left the Seasons Apartments and the following exchange occurred:
Q: Okay. I mean, I understand people do stuff when they’re intoxicated, okay? Bad decisions.
A: Yes, sir.
Q: You know, we have talked to people. You’re not — you’re not — we’re just not pulling you out of the phonebook and saying this is Jacorroyn Wilson, okay? I mean, if you had a chance to defend yourself, you defended yourself. If the guy came out with a shotgun as you were trying to get the vehicle and get home—
*1007 A: This is not what happened.
Q: Okay. So, what happened?
A: I — I done told you. I’ve told you.
Q: Okay.
A: I told you I wanted to terminate this interview.
Q: But you’re leaving out big major parts out — big major space. Big major space. And again, Corrie—
A: When I got here the damn story was already here before I got here. All right. So, y’all put that together. All right. If the story made it here before I did then there was some walking and shit going on.
Q: There was some walking?
A: I mean, I had to walk. I had to walk. I had to run.
Defendant continued to answer questions and eventually confessed to killing Mr. Worthington, telling police that he killed him with a small shovel following a physical altercation. He stated that the fight started after |inMr. Worthington shot at him with a shotgun and yelled racial slurs. After beating Mr. Worthington with the shovel, he ransacked his home looking for keys to the Ford F-150, which he found in the truck. He took Mr. Worthing-ton’s cell phone, driver’s license and bank cards and left in Mr. Worthington’s truck. When he arrived in Tyler, he hid Mr. Worthington’s driver’s license and bank cards under the seat in the truck and then abandoned it. The audio on the recording went out briefly at various times during the remainder of the interview, specifically when police were asking Defendant about Mr. Worthington’s shotgun and where he died. The audio also cut off when Defendant was responding to questions regarding the location of Mr. Worthington’s cell phone and whether he felt remorse for the murder. Near the end of the interview, Defendant stated that his confession had been voluntary and was not the result of any threats or inducements on the part of police.
After the jury trial, at which the facts related above were established, Defendant was found guilty as charged. On December 9, 2015, he was sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence for his second degree murder conviction and to three years at hard labor for the resisting an officer with force or violence conviction. The sentences were ordered to run concurrently. Defendant now appeals.
DISCUSSION

Denial of the motion to suppress

On appeal, Defendant asserts that the trial court erred in denying his motion to suppress his confession to the crime. He argues that the problems with the audio content of his recorded statement created an incomplete and |ninaccurate record. In support of his position, he cites La. R.S. 15:450; State v. Landry, 97-0499 (La. 6/29/99), 751 So.2d 214; and State v. Ford, 338 So.2d 107 (La. 1976). He also contends that his statement should have been suppressed because he invoked his right to remain silent on three separate occasions, but the police officers continued to interrogate him.
The state counters that the trial court properly denied Defendant’s motion to suppress and asserts that, because the recorded statement and transcript were admitted at trial without objection, Defendant is foreclosed from arguing on appeal about their allegedly improper admission. It further argues that State v. Landry, supra, and State v. Ford, supra, are inap-posite because, in those cases, significant portions of the trial transcript were not recorded or were unavailable on appeal. Here, the state points out, the redacted *1008 video and transcript of Defendant’s statement are available to both Defendant’s appellate attorney and this court. It contends that Defendant failed to unequivocally invoke his right to remain silent during the interview; and, therefore, police were permitted to continue questioning him. In support of its position, the state cites State v. Robertson, 97-0177 (La. 3/4/98), 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); State v. Deen, 42,403 (La.App. 2 Cir. 4/27/07), 953 So.2d 1057; and State v. Reed, 00-1537 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, writ denied, 02-1313 (La. 4/25/03), 842 So.2d 391.
Louisiana law prohibits review of an error at trial unless it was objected to at the time of the occurrence of the error. La. C. Cr. P. art. 841(A); State v. Thomas, 427 So.2d 428 (La. 1982); State v. Grant, 41,745 (La.App. 2 Cir. 4/4/07), 954 So.2d 823, writ denied, 07-1193 (La. 12/7/07), 969 So.2d 629. This “contemporaneous objection” rule serves |12two purposes: (1) to put the trial judge on notice of the alleged irregularity to allow him to cure the problem and (2) to prevent a defendant from gambling for a favorable verdict and then later appealing based on errors that could have easily been corrected by an objection at the time of the error. State v. Thomas, supra.
The contemporaneous objection requirement does not apply to a trial court’s ruling on a written motion. La. C. Cr. P. art. 841(B). However, appellate review of the trial court’s ruling is limited to the subject of the written motion. See, e.g., State v. Small, 50,388 (La.App. 2 Cir. 2/24/16), 189 So.3d 1129; State v. Butler, 30,798 (La.App. 2 Cir. 6/24/98), 714 So.2d 877, writ denied, 98-2217 (La. 1/8/99), 734 So.2d 1222.
When a court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the court’s discretion; that is, unless such ruling is not supported by the evidence. See State v. Green, 94-0887 (La. 5/22/95), 655 So.2d 272. However, a court’s legal findings are subject to a de novo standard of review. See State v. Hunt, 09-1589 (La. 12/1/09), 25 So.3d 746.

Interruptions of the audio recording

La. R.S. 15:450 provides:
Every confession, admission or declaration sought to be used against any one [sic] must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.
In State v. Jackson, 523 So.2d 251 (La. App. 2d Cir. 1988), writ denied, 530 So.2d 565 (La. 1988), the defendant, citing La. R.S. 15:450, argued that the trial court erred in allowing his statement to be admitted at trial because, among other things, the sound was not audible in vari-ousJjjjportions of the interview. This court denied the defendant’s claim, explaining:
This article [La. R.S. 15:450] is inapplicable to the defendant’s argument. The article is aimed at the editing of confessions or admissions. In the present case, the video statement was not edited in any way. However, the defendant claims the statement was not used in its entirety because of the poor quality of the sound.
Although the sound was not of the best quality, as the trial court noted, the import of the confession was clear and the video taped statement was presented to the jury in its entirety. The determination regarding the audibility of the tapes rests within the trial judge’s sound discretion. State v. Hennigan, 404 So.2d *1009 222 (La. 1981). In this case, there is no showing that the trial court abused its discretion in admitting into evidence this video taped statement.
Id. at 260.
As noted by the state, State v. Landry, supra, and State v. Ford, supra, are distinguishable from the instant case. In both of those cases, whole sections of the trial proceedings were not transcribed, which left the appellate court without a record to review and denied the defendant his right of appeal, especially considering that his appellate attorney did not serve as his trial attorney.
Defendant’s arguments regarding the admissibility of his confession were preserved for appeal by virtue of the fact that he filed a motion to suppress raising the same claims. State v. Small, supra. However, his contention that his confession should have been suppressed due to the lack of audio during certain portions of the interview is unavailing. As was the case in State v. Jackson, supra, the entire available recording of the interview (other than the portions which were redacted by agreement of the parties) was provided to the jury, and the jury was informed of the audio issues. Furthermore, a review of the recording reveals that the most crucial | uportions of the interrogation, including Defendant’s confession, were adequately recorded with audio content. For the foregoing reasons, this portion of Defendant’s assignment of error is without merit.

Defendant’s invocation of the right to remain silent

When seeking to introduce a statement made by a defendant during custodial interrogation, the state must prove two things. First, the state must affirmatively prove that the statement was voluntary and “not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.” La. R.S. 15:451; State v. Leger, 05-0011 (La. 7/10/06), 936 So.2d 108, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). Second, the state must show that law enforcement officers advised the defendant of his Miranda rights and that he knowingly waived those rights. State v. Moseley, 587 So.2d 46 (La. App. 2d Cir. 1991), writ denied, 589 So.2d 1066 (La. 1991), citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Even after waiving his Miranda rights, a defendant may invoke such rights at any time prior to or during questioning. State v. Leger, supra. A defendant’s invocation of his right to remain silent, just as a request for counsel, must be clear and unambiguous. Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), citing Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). However, Miranda does not require that a defendant exercise his right to remain silent by any particular phrasing. In fact, the U.S. Supreme Court in Miranda stated, if the individual “indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.” Miranda, supra.
b Jn State v. Robertson, supra, the defendant, following his conviction for murder, claimed on appeal that the trial court erred in admitting his confession, arguing that he invoked his Fifth Amendment right to remain silent when he responded “uh uh” to questioning about whether he wanted to say anything more about his involvement. The Louisiana Supreme Court found that the defendant’s indication that he had nothing further to say about the crimes did not reasonably suggest a desire to end all questioning or to remain silent. Rather, the defendant’s negative reply, “uh uh,” *1010 could not plausibly be understood as an invocation, ambiguous or otherwise, to terminate police questioning in all respects. Instead, the defendant’s willingness to talk to authorities even after the “uh, uh” response was evidenced by his continuing to respond to questions and to assert his innocence. The court noted that the defendant never indicated he did not want to speak to the police at all, only that he had nothing to say about the murders. The fact that the defendant continued to speak to police reflected an intent to continue the exchange. Id. at 31.
In State v. Deen, supra, the defendant moved to suppress a statement he made to police confessing to assaulting his stepsister on the basis that he invoked his right to remain silent prior to making the admission. A recording of the interview revealed that, prior to the incriminating statements, within the first half-hour of a three-hour interview, the defendant told police “Okay, if you’re implying that I’ve done it, I wish to not say any more. I’d like to be done with this. Cause that’s just ridiculous. I wish I’d ... don’t wish to answer any more questions.” The trial court granted the motion and the state sought supervisory review. This court granted the 11fistate’s writ application and reversed, explaining that the defendant’s request was not an unambiguous invocation of his right to remain silent:
In the pi’esent case, the clear context of the interview indicates that the defendant said that he wished to stop the questioning if the detective believed him responsible for the attack on his sister. The defendant did not indicate that he no longer wanted to answer all questions under other circumstances, nor would a reasonable police officer have interpreted this ambiguous statement as a clear desire to invoke the right to remain silent and halt the proceedings.
Id. at 1060.
In State v. Reed, supra, the Louisiana Third Circuit Court of Appeal rejected the defendant’s claim on appeal that his confession should have been suppressed at trial because he invoked his right to remain silent prior to making the incriminating statements. The court explained that the defendant’s statement that “I want ... I want to give ya’ll a statement but I don’t ... I’d rather not be doing it. Another time if we could man” was not a specific invocation of his right to remain silent. Id. at 1273-1274.
In State v. Blank, 04-0204 (La. 4/11/07), 955 So.2d 90, cert. denied, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007), the defendant complained on appeal from a murder conviction and capital sentence that the trial court erred in denying his motion to suppress his confession because it was not voluntarily made. In particular, the defendant claimed, among other things, that the length of the interrogation (12 hours) and the physical and mental distress suffered by him during the interrogation resulted in an involuntary statement. Notably, in rejecting the defendant’s claims, the court twice explained that the defendant “never requested to terminate the interview.” The defendant also argued that the police should have informed him, prior to commencement of the interrogation, that he had the right to 117refuse to answer questions even after he initially waived his right to remain silent. The court, finding no merit to the defendant’s argument, explained:
Although officers did not expressly inform defendant that he could exercise his right to cease answering questions during the interview, he fails to show grounds for relief. Although Miranda zealously protects the right of an arres- *1011 tee to terminate custodial interrogation at any point he chooses, 884 U.S. at 445, 86 S.Ct. at 1612, and the police must scrupulously honor the assertion of that right, Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), Miranda did not expressly require that advice as a subpart of the broader advisement with respect to the right to remain silent. State v. Chevalier, 458 So.2d 507, 514 (La. App. 4th Cir. 1984). Further, the right to remain silent embodies the right to terminate questioning. It is the tool by which a suspect can control the time of questioning, the topics discussed, and duration of the session. State v. Phillips, 444 So.2d 1196, 1198, n. 5 (La. 1984), (discussing Michigan v. Mosley); State v. Loyd, 425 So.2d 710, 716 (La. 1982). As noted by the trial court in its ruling, officers administered Miranda warnings no less than nine times during the interview, and in these circumstances, defendant makes no showing that he did not know he could terminate the interrogation. This claim lacks merit.
Id. at 110.
In State v. Leger, supra, the defendant gave five recorded statements to police and moved to suppress the statements pri- or to his murder trial. The trial court denied the motion and the statements were admitted at trial. The defendant, who received a capital sentence, appealed to the Louisiana Supreme Court, arguing, among other things, that his statements should have been suppressed because they were obtained in violation of his right to counsel and his right to remain silent. On appeal, the state conceded that the defendant’s first statement had been obtained in violation of his right to remain silent. The Louisiana Supreme Court agreed, explaining that, after the defendant was informed of his Miranda rights, he stated several times that “he did not want to talk.” Additionally, the defendant gave unresponsive answers to the police officers’ questions, placed his head down 11son the desk or in his hands and cried intermittently. Finally, when the defendant became wholly unresponsive to questioning, two different police officers began interrogating the defendant, resulting in the defendant’s admission of incriminating information.
The Leger court concluded that the statement should have been suppressed:
We find that Lt. Guillory and Agent Rupert failed to honor the defendant’s invocation of his right to remain silent and that the defendant’s statements during this portion of the interview, after he first invoked his right to remain silent, should not have been admitted in evidence. In addition, we find that the continued interrogation by Chief McGuire and Detective Sonnier did not “scrupulously honor” the defendant’s invocation of his constitutional right to remain silent. The police practices on display here are specifically proscribed in Mosley, “where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.” Mosley, 423 U.S. at 105-106, 96 S.Ct. at 327. We hold that the trial court abused its discretion in failing to suppress the portion of the first videotaped statement after the point where the defendant first invoked his “right to cut off questioning” and in finding that the first statement was admissible in its entirety.
Id. at 126-27. Nonetheless, the court explained that improper admission of the defendant’s first statement was subject to harmless error analysis, albeit a somewhat *1012 more critical harmless error analysis, stating as follows:
“[t]he admission of an involuntary confession is a ‘trial error,’ similar in both degree and kind to the erroneous admission of other types of evidence” which must be reviewed to determine whether the error was harmless. Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); State v. Harris, 2001-2730 p. 26 (La.1/19/05), 892 So.2d 1238, 1260, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005); Koon, 1996-1208 p. 9, 704 So.2d at 763. “An error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error.” Koon, 1996-1208 p. 9, 704 So.2d at 763.
^Reviewing courts must take great care in reviewing whether the admission of a coerced confession constitutes harmless error. In Fulminante, the Supreme Court cautioned:
A confession is like no other evidence. Indeed, “the defendant’s own confession is probably the most probative and damaging evidence that can be admitted against him ... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.” Id., 499 U.S. at 296, 111 S.Ct. at 1257, citing Bruton v. United States, 391 U.S. 123, 139-140, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J. dissenting).
After reviewing the evidence, the Leger court found that the case proved the rule of Fulminante. Not only did it find that introduction into evidence of the defendant’s December 11, 2001 interrogation statements was harmless error beyond a reasonable doubt, it further held that neither the guilty verdict nor the penalty determination was attributable to the admission of any of the defendant’s statements. The state presented both eyewitnesses and tangible evidence to prove its case beyond a reasonable doubt.
In the case sub judice, Defendant asserts that his confession should have been suppressed because he requested, on three separate occasions, to “terminate” the interview.[9] Defendant’s first invocation of his right to remain silent by expressly stating that he “would like to terminate this interview” was a more definite and unequivocal invocation than those made by the defendants in State v. Robertson, supra; State v. Deen, supra; and State v. Reed, supra. Additionally, as noted above, in State v. Blank, supra, | gnthe Louisiana Supreme Court, citing the U.S. Supreme Court’s opinion in Mosley, supra, specifically used the term “terminate” when discussing the appropriate language a defendant may utilize to cease police interrogation.
Given the more definite and unambiguous language used by Defendant, we conclude that he invoked his right to remain silent when he first stated that he would “like to terminate this interview.” As such, any statements he made after his initial request to terminate the interview should have been suppressed by the trial court. Notably, Defendant admitted to punching Dep. McDaniel prior to his first request that the interview be terminated.
The determination that Defendant’s statement should have been sup *1013 pressed after he invoked his right to remain silent does not end this court’s inquiry into the matter. The improper admission of a confession is a trial error subject to harmless error analysis. As in Leger, supra, the state in the case at bar presented sufficient evidence to prove its case beyond a reasonable doubt.
At trial, Dep. McDaniel testified that, on May 1, 2015, he came into contact with Defendant at the Seasons Apartments, which is located down the street from Mr. Worthington’s home.[10] Ms. Keel testified that the next day, May 2, 2015, she discovered that Mr. Worthington had been murdered and that his truck and cell phone had been stolen. The cell phone was discovered in Tyler, Texas, and Mr. Worthington’s vehicle was located just blocks down the street from where Defendant was found hiding in his ex-girlfriend’s attic. Two days after police arrested Defendant, the father of 1 ^Defendant’s ex-girlfriend, Mr. Sparks, who had assisted officers in apprehending Defendant, turned over a pair of boots to Tyler Police Investigator James Riggle. Mr. Worthington’s blood was discovered on the boots and shoe print marks left at Mr. Worthington’s home matched the prints from the soles of the boots. The foregoing evidence provided the jury with sufficient evidence, even absent Defendant’s confession, to convict him of Mr. Worthington’s murder. For the foregoing reasons, this assignment of error is -without merit.

Prejudicial autopsy photographs

At trial, during Dr. Traylor’s testimony and over Defendant’s objection, 32 autopsy photographs taken of Mr. Worthington’s body were admitted into evidence. The photographs show images of two wounds (the injuries caused by blunt force trauma to Mr. Worthington’s head above his left eye and his neck), both of which Dr. Tray-lor opined could have been the fatal injuries, as well as multiple lacerations and abrasions on various parts of Mr. Wor-thington’s body. The photographs depict the autopsy of Mr. Worthington’s skull, including graphic images of the inside of his skull above his left eye where' the area was driven inward, fracturing the skull. Some photographs, where measurements are being shown of a specific laceration or abrasion, contain images of other injuries which are measured in separate photographs.
On appeal, Defendant contends that the trial court erred in allowing the photographs to be admitted into evidence because they were gruesome and highly prejudicial. He also points out that only a few of the photographs captured images of the fatal blows and that many were redundant. He 1 ^alleges that the probative value of the photographs was outweighed by their prejudicial effect.
The state counters that the photographs were properly admitted because they all were probative as to the injuries suffered by Mr. Worthington during the struggle with Defendant. Additionally, the photographs of the fatal injuries were probative as to the cause of Mr. Worthington’s death and helped establish the murder weapon.
“Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing, or place depicted.” State v. Sepulvado, 93-2692 (La. 4/8/96), 672 So.2d 158, 164, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). A district court’s ruling with respect to the admissibility of *1014 photographs will not be overturned unless it is clear the prejudicial effect of the evidence outweighs its probative value. State v. Magee, 11-0574 (La. 9/28/12), 103 So.3d 285, cert. denied, — U.S. -, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013).
Even when the cause of death is undisputed, the state is entitled to the moral force of its evidence and post-mor-tem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as the location and placement of wounds, and to provide positive identification of the victim. Id., citing State v. Koon, 96-1208 (La. 5/20/97), 704 So.2d 756, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997).
Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors’ reason and leads them to convict without sufficient other evidence. State v. Koon, supra. The admission of “gruesome photographs isj^not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect.” State v. Broaden, 99-2124 (La. 2/21/01), 780 So.2d 349, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001).
The autopsy photographs admitted into evidence, although numerous, were not so prejudicial as to outweigh their probative value. The photographs depict the numerous wounds suffered by Mr. Worthington during the struggle with Defendant, including two substantial injuries, both of which Dr. Traylor opined could have been fatal. None of the photographs are particularly gruesome or bloody and the only notably graphic photographs are those showing the inside of Mr. Worthing-ton’s skull where the area above his left eye was driven inward as a result of blunt force trauma. The photographs serve to identify the victim and demonstrate the manner in which he died.
Accordingly, this assignment of error lacks merit.

Pro Se Assignment of Error: Ineffective Assistance of Trial Counsel

Defendant contends that his trial attorney was ineffective for failing to present “any form of a defense” in his case. In particular, he takes issue with the fact that his trial attorney conceded during closing argument that he “has owned killing Mr. Worthington with that shovel. That was in his confession — in his admission.” His trial attorney thereafter pointed out his client’s youthful age (24) and the fact that both he and the victim were intoxicated at the time of Mr. Worthington’s death and asked the jury to find Defendant guilty of manslaughter rather than second degree murder. Defendant asserts that his trial attorney’s concession, along with the fact that he did not call a single witness to testify on his behalf, amounted to a denial l^of his right to effective assistance of counsel. Defendant cites Haynes v. Cain, 272 F.3d 757 (5th Cir. 2001), on reh’g en banc, 298 F.3d 375 (5th Cir. 2002); and Cave v. Singletary, 971 F.2d 1513 (11th Cir. 1992), in support of his claim.
Defendant also generally alleges “systematic ineffective assistance of counsel” by the DeSoto Parish Indigent Defender Board and state public defenders due to lack of funding, time constraints and alleged improper training of public defenders. He does not specifically allege how any of these purported issues with the DeSoto Parish Indigent Defender Board impacted his case.
The state points out that, while the U.S. Fifth Circuit Court of Appeals in Haynes v. Cain, supra, initially determined that it was ineffective assistance of counsel for a trial attorney to concede in his opening *1015 statement that his client had committed murder, the decision was reversed on en banc rehearing. Therefore, the state argues that Defendant’s reliance on Haynes v. Cain, supra, is inappropriate. Furthermore, it argues that the instant case is distinguishable from Haynes v. Cain, supra, because here, Defendant confessed to the murder of Mr, Worthington. It also asserts that Cave v. Singletary, supra, is inapposite because, in that case, it was shown that defense counsel’s representation was grossly incompetent and additionally notes that the U.S. Eleventh Circuit Court of Appeals concluded that the defendant failed to prove that his trial attorney’s deficient performance prejudiced his ease because “his confession to robbery sealed his conviction for felony murder.”
Both the) ¾ Louisiana and federal constitutions guarantee a criminal defendant’s right to the effective assistance of counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); State v. Brooks, 94-2438 (La. 10/16/95), 661 So.2d 1333.
When a defendant seeks reversal of a conviction based on ineffective assistance of counsel, he must establish two separate elements to succeed. First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that he was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that, but for counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Id.; State v. Moran, 47,804 (La.App. 2 Cir. 4/10/13), 135 So.3d 677, writ denied, 13-1052 (La. 11/15/13), 125 So.3d 1101.
An assessment of an attorney’s performance requires his conduct to be evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel’s judgment, tactical decisions and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Moore, 48,769 (La.App. 2 Cir. 2/26/14), 134 So.3d 1265, writ denied, 14-0559 (La. 10/24/14), 151 So.3d 598.
Generally, a claim of ineffective assistance of counsel is properly raised in an application for post-conviction relief (“PCR”) in the trial court. State ex rel. Bailey v. City of W. Monroe, 418 So.2d 570 (La. 1982); State v. Ellis, 42,520 (La.App. 2 Cir. 9/26/07), 966 So.2d 139, writ denied, 07-2190 (La. 4/4/08), 978 So.2d 325. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. Id. A motion for new trial is also an acceptable vehicle by which to raise such a claim. State v. Williams, 33,581 (La.App. 2 Cir. 6/21/00), 764 So.2d 1164. When the record is sufficient, the claim may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La. 1982); State v. Willars, 27,394 (La.App. 2 Cir. 9/27/95), 661 So.2d 673.
In State v. Holmes, 95-0208 (La. App. 4th Cir. 2/29/96), 670 So.2d 573, the defendant complained that his trial attorney was ineffective because during closing argument, his counsel “informed the jury that the [defendant] admitted to him that he committed the crime.” The court found that the defendant had not shown ineffective assistance of counsel, explaining:
*1016 Trial counsel used the only possible defense to help explain why his client cashed a stolen S.S.I. check from an elderly man. Counsel’s strategy was to win the sympathy of the jury by telling them that he was only a minor player. A trial counsel’s trial strategy does not constitute ineffective assistance of counsel.
Id. at 577.
In State v. Legrand, 02-1462 (La. 12/3/03), 864 So.2d 89, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005), the defendant was charged with first degree murder. During his opening statement, defense counsel stated, “Michael Legrand is guilty of second degree murder.” The court found that the trial attorney was not ineffective |¡>7because he was attempting to persuade the jury that the defendant was guilty of the lesser included offense of second degree murder.
As noted by the state, the cases cited by Defendant do not support a finding that he was denied effective assistance of counsel. In Haynes v. Cain, supra, on en banc rehearing, the appellate court reversed the district court’s grant of habeas corpus after determining that trial counsel’s admission during opening statement that his client was guilty of second degree murder did not amount to ineffective assistance of counsel. In short, the court explained that the defendant’s trial counsel was faced with “nearly conclusive proof’ of the defendant’s guilt and utilized a strategy to avoid a death sentence for the defendant. Additionally, the court explained that, even assuming that the admission amounted to deficient performance, given the overwhelming evidence of the defendant’s guilt, he failed to prove the prejudice prong of Strickland, supra.
As noted above, in Cave v. Singletary, supra, although the defendant’s trial attorney’s performance was considered to be deficient (she conceded that the defendant had committed armed robbery during closing argument due to her misunderstanding of the felony murder rule), the defendant could not prove that his trial attorney’s errors prejudiced his case given the mountain of evidence demonstrating his guilt.
In the case at bar, Defendant’s trial attorney’s concession in his closing argument that Defendant had “owned killing Mr. Worthington” was obviously part of his trial strategy. The jury viewed Defendant’s confession during his trial. Defendant’s trial attorney attempted in his closing argument to convince the jury that, although his client had admitted to killing Mr. Worthington, they should return a verdict of manslaughter given his ^youthful age and the fact that he was intoxicated at the time of the crime. Although we previously determined Defendant’s confession should have been suppressed, but found it harmless error given the additional evidence proving that Defendant committed second degree murder, his trial attorney’s actions must be evaluated from counsel’s perspective at the time of the occurrence. Thus, defense counsel’s mention of Defendant’s confession during closing argument would likewise be harmless error. Defendant failed to show that the alleged general deficiencies of the De-Soto Parish Indigent Defender Board were at issue in his case.
Accordingly, this assignment of error is without merit.
CONCLUSION
For the aforementioned reasons, Defendant Jacorroyn Lavell Wilson’s convictions and sentences for resisting an officer by force or violence and for second degree murder are affirmed.
AFFIRMED.

. There was no testimony at trial regarding the basis for Deputy McDaniel’s attempt to restrain Defendant.

.Neither Mr. Sparks, nor his daughter, Ms. Lovelace, were available to testify at Defendant’s trial. Therefore, there was no evidence presented to indicate where the boots Mr. Sparks provided to Investigator Riggle had been found.

. The confession is discussed in greater detail below.

. The defendant waived his rights in writing.

. The trial court reviewed a recording entered into evidence as the State's "MTS-2." The record does not contain a DVD labeled as MTS-2. At trial, a redacted version of Defendant's statement, admitted into evidence as “S-143,” was played to the jury.

. Notably, Defendant did not seek supervisory review of the trial court’s ruling.

. Redacted by stipulation of the parties.

. Sgt. Chaisson, who identified the video recording, stated that the audio issues were due to "software glitches."

. The right to remain silent during police interrogation is separate and distinct from a defendanl’s right to counsel. See Miranda, supra; Berghuis, supra.

. The addresses appear to be approximately 1.2 miles apart.