Judgment rendered November 15, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,330-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                           Appellee

versus

DAVID WHITE                                  Appellant

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 20CR30685

Honorable Amy Burford McCartney, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Meghan Harwell Bitoun

CHARLES B. ADAMS                       Counsel for Appellee
District Attorney

EDWIN L. BLEWER
ETHAN ARBUCKLE
LISA D. LOBRANO
Assistant District Attorneys

* * * * *

Before PITMAN, COX, and ELLENDER, JJ.

**COX, J.**

This criminal appeal arises out of the 42nd Judicial District Court, DeSoto Parish, Louisiana. David White ("White") was charged by bill of indictment on March 2, 2020, with second degree murder in violation of La. R.S. 14:30.1. White was found guilty as charged by a unanimous jury and sentenced to life imprisonment without the possibility of probation, parole, or suspension of sentence. White now appeals, challenging the admission of certain autopsy photos introduced at trial. For the following reasons, we affirm.

**FACTS**

On January 31, 2020, DeSoto Parish officers were dispatched to 914 Railroad Avenue in Mansfield, Louisiana, concerning a gunshot victim, later identified as Tiffany Wilson ("Wilson"). After speaking with the homeowner, Lisa Moore ("Moore"), officers learned that White shot Wilson multiple times before he fled the scene. After officers located White near Blunt Mill Road, he was arrested and taken into custody for Wilson's death.

On September 28, 2022, before trial and outside the presence of the jury, counsel for White objected to the introduction of State's Exhibits S-5 through S-7 and S-43 through S-52. During the hearing, defense counsel argued that the photos of the victim were unnecessary and would only serve to "inflame the passions of members of the [j]ury." In response, the State argued it was "entitled to show the gravity of the offense," and the number of photos sought to be introduced was reduced to show the "bare minimum number of photos necessary to show the wounds that [were] described in [the coroner's] autopsy report."

In overruling the objection, the trial court stated it reviewed the photos in question and highlighted that the instant matter concerned a second degree murder charge where the State was required to show evidence regarding the victim and the wounds which caused her death. In acknowledging that one of the photos sought to be introduced depicted a "pretty substantial wound," the trial court determined that overall, the reduced number of photos in this matter, when compared to other photos previously admitted for the same or similar offenses, were not so overly gruesome that they should be removed from the jury's presence.

Jury trial proceeded on September 29, 2022, and the following pertinent facts were elicited through the testimony of witnesses, including police officers and forensic professionals involved in the case.[1]

Deputy Gabriel Whitaker ("Dep. Whitaker"), patrol deputy for DeSoto Parish Sheriff's Office ("DPSO"), testified he responded to a report that a woman had been shot multiple times, was not breathing, and was unresponsive. Dep. Whitaker stated that when he arrived, he saw the victim lying on the porch of the home on her back surrounded by blood with several bullet wounds on her body. He explained that he attempted to revive Wilson through chest compressions until emergency services arrived but was unsuccessful.

Next, Johnny Sudds, Jr. ("Sudds") testified that on the day in question, he was next door visiting his grandmother when he heard a series of gunshots. Sudds testified that when he went outside to find out what

---

[1] Beulah Wilson, the victim's mother, testified Wilson had three children and worked as a CNA. Tabatha Tucker, communications supervisor, confirmed that she received a 911 call on January 31, 2020, concerning the shooting.

happened, he saw a black male standing near a white truck just outside of Moore's home. Sudds explained that although he never saw the man shoot anyone, he did see him reloading the gun. Sudds stated that when he left to get help, he heard two more shots, returned to the area, and saw the same man leaving in the white truck. Sudds then explained he went to Moore's home to help until officers arrived.

Russ Jones ("Inv. Jones"), a criminal investigator for DPSO, testified he was dispatched to 914 Railroad Avenue, where his primary responsibility was to photograph the area. Inv. Jones then identified several photos the State introduced into evidence. He generally testified that the photos depicted Wilson and her injuries, the location where Wilson was shot, as well as surrounding items in relation to where she was found. Inv. Jones then identified several more photos that depicted various bullet holes on the screened portion of the porch and home where Wilson was shot, clothing in a laundry basket that was partially overturned, the wheelchair ramp leading up to the home, and Wilson's car. After he identified several spent .357 shell casings and bullets, Inv. Jones explained that officers found several deformed bullets and holes in the home and surrounding furniture that were also hit during the shooting.

Isaiah "Donte" Phillips ("Officer Phillips"), a patrol officer for DPSO, testified he received information from dispatch that a black male identified in a shooting on 914 Railroad Avenue was located near Blunt Mill Road in a white truck. Officer Phillips stated that after he reported the license plate of a truck that matched the description and confirmed that White was the driver, other officers blocked the vehicle, and forced White to stop. Officer Phillips stated that although White was ordered to exit the vehicle, White

3

refused and yelled for the officers to just "shoot [him]" because his life was over. Officer Phillips testified that officers then waited for Captain James Clements ("Cpt. Clements"), who was then able to arrest and take White into custody.

Cpt. Clements then identified White in open court and testified that on January 31, 2020, he received two phone calls from White. After the State introduced both recorded calls, Cpt. Clements testified that during the call White wanted to turn himself in, saying, "Clements, this is David. I done [expletive] up." Cpt. Clements explained that he went to Blunt Mill Road, arrested White, and brought him into custody.

Travis Chellette ("Inv. Chellette"), a criminal investigator for DPSO, testified that on January 31, 2020, he was called to collect and photograph evidence from White's truck. Inv. Chellette testified he documented the following items: 1) a revolver on the center console with six unspent .357 shells; 2) a brown belt and black holster for the revolver in the passenger compartment; 3) several spent shell casings that matched the caliber of the revolver; and 4) White's key and wallet.

Next, Deputy Jacqes Burton ("Dep. Burton") of DPSO, testified that his primary role in the investigation was to interview White and other witnesses. Dep. Burton stated that when he interviewed White, he learned that White had been in a relationship with Wilson, but in the week before the shooting, Wilson ended the relationship following an argument. Because White believed Wilson cheated, he went to Moore's house, where he knew Wilson was working, to exchange her clothing and other personal items for the extra key to his house.

Phillip Stout ("Stout"), the supervisor for the firearms division of North Louisiana Crime Lab and an expert in firearms identification, testified next. Stout stated he examined the recovered revolver, five fired cartridge cases recovered from the scene of the shooting, and six fired cartridge cases recovered from White's vehicle. Stout then explained the process used to determine whether the recovered revolver could have fired the cartridge cases and bullets found at the scene. He stated that after his examination, it was ultimately determined that all of the examined cartridge cases were fired from the revolver officers recovered from White's truck.

Next, Moore testified that she hired Wilson as a CNA to assist in the care of her husband who struggled with mobility following a stroke. Moore identified White in open court and testified she knew Wilson and White were in a relationship and that White would occasionally pick Wilson up after her shift ended. Moore testified that on the day of the shooting, Wilson arrived at her home around 8:30 a.m. Moore recalled that Wilson played a voicemail White left on her phone, where White generally accused Wilson of cheating, and noted that White did not sound upset or angry. Moore stated that around noon, she and Wilson heard a car horn. Moore explained that after she saw White's truck outside, she went back into the room with her husband, and Wilson went outside.

Moore recalled that about ten minutes later, she heard a series of gunshots and a noise at the door. She explained that when she went to see what happened, she saw Wilson lying on the porch just in front of the door with a gunshot wound on her side. Moore stated she saw White at the end of the ramp attached to the home, reloading a gun. Moore testified that she pled with White not to shoot again because her husband was inside, and

White repeatedly told her not to call the police. Moore stated she ignored White, went back into the home, and dialed 911 before she heard another series of gunshots. Moore testified that when the shooting stopped, she went back outside, Wilson was unresponsive, and there was more blood underneath her. Moore then testified that she attempted to perform CPR on Wilson, but was unable to revive her.

Dr. Joshua Sanderson ("Dr. Sanderson") was then accepted as an expert in forensic psychiatry. Dr. Sanderson testified he was previously appointed to evaluate whether White was competent to stand trial and whether he met the requisite criteria for sanity. Dr. Sanderson testified that during his evaluation, he considered and reviewed materials supplied to him from the court as well as White's own uninterrupted account of the incident. He stated that after two evaluations, he diagnosed White with major depressive disorder, an unspecified intellectual disability, and schizophrenia.

Dr. Sanderson concluded that despite the diagnoses, White, at the time of the offense, was able to discern the difference between right and wrong. He noted that this was evidenced by White providing a rationale for his actions, namely that: 1) White was upset with Wilson for allegedly stealing money from him, 2) Wilson's potential infidelity, and 3) Wilson offended White by calling him derogatory names. Dr. Sanderson further noted that White's behavior following the shooting also indicated his ability to discern right from wrong as White attempted to conceal his actions when he told Moore not to call the police, fled from the scene, and then called Cpt. Clements to turn himself in, where he admitted he "messed up." On cross-examination, Dr. Sanderson acknowledged the possibility that a person could satisfy the legal definition of insanity during the commission of an

offense and later discern that their actions were wrong. Dr. Sanderson explained that generally, for this to occur, a delusional construct must be in place, but this was not present during the instant offense.

Finally, Dr. James Traylor ("Dr. Traylor"), who performed the autopsy on Wilson, testified as an expert in forensic pathology regarding the results of the autopsy. Dr. Traylor testified that Wilson's cause of death was homicide as she was shot 12 times, with 11 of the gunshots being penetrating shots, which meant there was one hole for each gunshot, and one being perforating, such that there was both an entry and exit wound. Dr. Traylor explained that the gunshots were fired from some distance away from where Wilson stood as there was no evidence of close or immediate range of fire.

The State then introduced several photos of Wilson and her injuries, which Dr. Traylor identified for the court. From the photos, Dr. Traylor described and generally explained the placement of each gunshot wound on Wilson's body. Dr. Traylor stated that Wilson sustained several different fatal wounds, but the bullet that struck Wilson in the chest was the most life-threatening as it tore a hole through the right ventricle of the heart.

After closing arguments, White was convicted as charged by a unanimous jury. On October 20, 2022, the trial court, after hearing victim impact statements and reviewing White's criminal history, sentenced him to life imprisonment at hard labor for second degree murder, to be served without the possibility of probation, parole, or suspension of sentence.

## DISCUSSION

By White's sole assignment of error, he argues the admission of the victim's autopsy photos over his objections was unnecessary and gruesome,

inflammatory, and unduly prejudicial, thereby warranting a reversal of his conviction. Additionally, White claims State's evidence S-43 through S-52, as well as three additional crime scene photos, should not have been admitted because the issue before the trial court was not the cause of Wilson's death, but whether he possessed the requisite intent to commit the offense. In contrast, the State argues the photos were properly admitted because they were specifically introduced to positively identify the victim, establish cause of death, location and placement of wounds, and "satisfy the elements of second degree murder."

The standard by which gruesome photos may be admitted as evidence at trial is well settled, and in *State v. Huff*, 27,212 (La. App. 2 Cir. 08/23/95), 660 So. 2d 529, *writ denied*, 96-0212 (La. 05/01/97), 693 So. 2d 754, this Court previously expounded that:

> Photographs which illustrate any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible. Autopsy photographs are admissible to corroborate other evidence establishing the cause of death, the manner in which the death occurred, and the location, severity, and number of the wounds.

As such, photographic evidence will be admitted unless it is so gruesome that it overwhelms the juror's reason and leads them to convict without sufficient other evidence. *State v. Wilson*, 50,865 (La. App. 2 Cir. 11/11/16), 208 So. 3d 999. The admission of "gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect." *Id.*

However, even when the cause of death is undisputed, the State is entitled to the moral force of its evidence and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other

8

evidence establishing cause of death, as well as the location and placement of wounds, and to provide positive identification of the victims. *Id.*; *State v. Koon*, 96-1208 (La. 5/20/97), 704 So. 2d 756, *cert. denied*, 522 U.S. 1001, 118 S. Ct. 570, 139 L. Ed. 2d 410 (1997). Moreover, a district court's ruling with respect to the admissibility of photographs will not be overturned unless it is clear the prejudicial effect of the evidence outweighs its probative value. *State v. Wilson*, *supra*.

Although White asserts that the issue before the trial court was whether he maintained the requisite intent to commit the offense, thereby diminishing the necessity of the autopsy photos, we note that when defense counsel lodged its objection to the admissibility of the photos, no argument was made to address White's mental capacity. Instead, counsel primarily argued that the autopsy photos would inflame the jury because they were gruesome in nature. Therefore, the only issue before the court is whether the autopsy photos were so gruesome in nature they would inflame the jury and were so prejudicial as to outweigh their probative value.

After reviewing the evidence, we cannot say the trial court abused its discretion in admitting the autopsy photos of the victim, nor can we conclude that the photos in question were so gruesome as to unfairly prejudice White's case. We first note, as the trial court highlighted, that the State significantly reduced the number of autopsy photos sought to be submitted. In doing so, the State presented the minimum number of photos necessary to reflect Dr. Traylor's autopsy report, who later opined that any of the 12 gunshot wounds Wilson suffered could have been fatal, but noted the wound in Wilson's chest was the most life-threatening.

This court recognizes that any photo depicting multiple gunshot wounds could be considered gruesome in nature; however, in this case, none of the photos introduced at trial were so particularly gruesome or graphic in nature that it would inflame the jury. As the trial court noted, the photos in question merely served to identify the victim, show different angles of the wounds, and demonstrate the manner in which she died.

Accordingly, we find that this assignment of error lacks merit.

## CONCLUSION

For the aforementioned reasons, White's conviction and sentence for second degree murder are affirmed.

**AFFIRMED.**